# EXHIBIT A



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

Audit Services

March 5, 2019

TO:        Mark A. Brown
           Chief Operating Officer
           Federal Student Aid

FROM:      Bryon S. Gordon /s/
           Assistant Inspector General for Audit

SUBJECT:   Reissuance of Final Audit Report, "Federal Student Aid: Additional Actions Needed to
           Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally
           Held Student Loans," Control Number ED-OIG/A05Q0008

The attached final audit report, originally issued on February 12, 2019, was reissued on March 5, 2019.
After we issued our final audit report on February 12, 2019, we became aware of one instance where a
statement made in the report did not reflect supporting audit documentation. We were also provided
with additional documentation after the issuance of the audit report that required clarification of a
second statement made in the audit report. Once these items were brought to our attention, we
conducted a full review of the supporting documentation for the entire report and identified one
additional statement that warranted clarification. This review identified no additional issues with the
quality of the audit report. We consider these items to be minor corrections. They do not have an effect
on our conclusions or recommendations.

First, on page 15, we reported: "In 2017, FSA reduced payments to Great Lakes by $1,260, New
Hampshire by $37,438, and Oklahoma by $42,550 because the three servicers billed FSA for borrower
accounts despite not complying with administrative forbearance requirements." Although the amounts
of the reduced payments are correct, the reason for the reduced payments is not. FSA reduced
payments to these three servicers because the servicers did not comply with the requirements of an
interest rate reduction program. The report now identifies the correct reason for the reduced payments.

Second, in our response (page 19) to FSA's comments about FSA's May 2017 report on its March 2017
review of Navient, we stated that FSA's comments did not: ". . . accurately reflect the FSA review team's
work and observations. The review team's sample did not include only short-duration calls. The review
team's report clearly stated that all calls were included in the review team's universe." On
February 19, 2019, Navient provided a copy of the instruction from the FSA review team and informed
us that FSA had requested that Navient provide only short-duration calls for the review. We revised our
response to FSA's comment.

400 MARYLAND AVENUE, S.W., WASHINGTON, DC 20202-1510

*Promoting the efficiency, effectiveness, and integrity of the Department's programs and operations.*

Finally, in the Scope and Methodology Appendix (page 25), we stated that the five components of internal control apply to four categories of the objectives for internal control. The GAO Standards for Internal Control divide the objectives for internal control into three categories, not four. We revised the report to reference only three categories of internal control objectives under the GAO standards.

ii

**U.S. Department of Education**
**Office of Inspector General**

# Federal Student Aid: Additional Actions Needed to Mitigate the Risk of Servicer Noncompliance with Requirements for Servicing Federally Held Student Loans

February 12, 2019
ED-OIG/A05Q0008

## NOTICE

Statements that managerial practices need improvements, as well as other conclusions and recommendations in this report, represent the opinions of the Office of Inspector General. The appropriate Department of Education officials will determine what corrective actions should be taken.

In accordance with the Freedom of Information Act (Title 5, United States Code, Section 552), reports that the Office of Inspector General issues are available to members of the press and general public to the extent information they contain is not subject to exemptions in the Act.



**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE OF INSPECTOR GENERAL

Audit Services

February 12, 2019

TO:         James F. Manning
            Acting Chief Operating Officer
            Federal Student Aid

FROM:       Bryon S. Gordon /s/
            Assistant Inspector General for Audit

SUBJECT:    Final Audit Report, "Federal Student Aid: Additional Actions Needed to Mitigate the Risk
            of Servicer Noncompliance with Requirements for Servicing Federally Held Student
            Loans," Control Number ED-OIG/A05Q0008

Attached is the subject final audit report that consolidates the results of our audit of Federal Student
Aid's oversight of servicers. We received your written comments disagreeing with the overall conclusion
presented but agreeing with the recommendations in our draft audit report and have included those
comments at the end of this report.

U.S. Department of Education policy requires that you develop a final corrective action plan within
30 days of the issuance of this report. The corrective action plan should set forth the specific action
items and targeted completion dates necessary to implement final corrective actions on the findings and
recommendations contained in this final audit report. Corrective actions that your office proposes and
implements will be monitored and tracked through the Department's Audit Accountability and
Resolution Tracking System.

In accordance with the Inspector General Act of 1978, as amended, the Office of Inspector General is
required to report to Congress twice a year on the audits that remain unresolved after 6 months from
the date of issuance.

We appreciate your cooperation during this review. If you have any questions, please contact me at
(202) 245-6900 or Bryon.Gordon@ed.gov or Gary D. Whitman, Regional Inspector General for Audit, at
(312) 730-1620 or Gary.Whitman@ed.gov.

# Table of Contents

Results in Brief ........ 1

Introduction ........ 5

Finding 1. FSA Did Not Track All Identified Instances of Noncompliance and Rarely Held Servicers Accountable for Noncompliance with Requirements ........ 9

Finding 2. Information Necessary to Ensure Servicer Compliance Not Always Complete 21

Appendix A. Scope and Methodology ........ 24

Appendix B. FSA's Oversight of Servicers ........ 30

Appendix C. Federal Requirements that Apply to Loan Servicing ........ 38

Appendix D. Acronyms and Abbreviations ........ 40

FSA Comments ........ 41

## Results in Brief

### What We Did

The objective of our audit was to determine whether Federal Student Aid (FSA) had established policies and procedures to mitigate the risk of servicers not servicing federally held student loans in accordance with Federal requirements. We assessed FSA's operations as of September 2017.

To answer the objective, we first gained an understanding of the five components of a system of internal control relevant to FSA's oversight of the servicing of federally held student loans.[1] We concluded that the control activities component of FSA's system of internal control was most relevant to our audit objective.[2] Next, we identified the control activities that FSA had established to mitigate the risk of servicers not servicing federally held student loans in accordance with Federal requirements. We then assessed the adequacy of the design of the following control activities that we determined had the greatest impact on the effectiveness of FSA's oversight:

- monitoring telephone calls between servicer representatives and borrowers and providing feedback about the monitoring to servicers,

- conducting reviews of servicers' compliance with requirements for servicing federally held student loans, and

- reviewing independent auditors' reports on audits of servicers' systems of internal control.[3]

Finally, we evaluated whether the policies and procedures provided reasonable assurance that the risk of servicers not servicing federally held student loans in accordance with Federal requirements was mitigated.

---

[1] "Standards for Internal Control in the Federal Government" (Government Accountability Office, September 2014) sets the internal control standards for Federal agencies. The standards are organized into five components—control environment, risk assessment, control activities, information and communication, and monitoring.

[2] Control activities are the actions management establishes through policies and procedures to achieve objectives and respond to risks.

[3] Audits of service organizations' systems of internal control completed by independent auditors following "Statement on Standards for Attestation Engagements," No. 18, issued by the American Institute of Certified Public Accountants.

U.S. Department of Education
Office of Inspector General
ED-OIG/A05Q0008

1

## What We Found

FSA had not established policies and procedures that provided reasonable assurance that the risk of servicer noncompliance with requirements for servicing federally held student loans was mitigated.

FSA's oversight activities regularly identified instances of servicers' not servicing federally held student loans in accordance with Federal requirements. From January 1, 2015, through September 30, 2017, 61 percent (210) of 343 reports on FSA's oversight activities disclosed instances of servicer noncompliance. FSA management routinely tracked the instances of noncompliance that servicers did not remediate before FSA issued a final review report. However, it did not track the identified instances of noncompliance that servicers remediated, even though FSA management could have used such information to identify patterns of noncompliance. FSA management also had not analyzed the information it did track to identify trends and recurring instances of noncompliance at each servicer and across all servicers.

FSA management rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance. It also did not incorporate a performance metric relevant to servicer compliance with Federal requirements into its methodology for assigning loans to servicers (see Finding 1).[4] By not holding servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA did not provide servicers with an incentive to take actions to mitigate the risk of continued servicer noncompliance that could harm students. Further, FSA's not holding servicers accountable could lead to servicers being paid more than they should be (the contracts with servicers allow FSA to recover amounts paid for loans not serviced in compliance with requirements).

Additionally, FSA employees did not always follow policy when evaluating the quality of servicer representatives' interactions with borrowers, and FSA did not provide reports of failed calls to servicers during a 10-month period, from June 2016 through March 2017 (see Finding 2). As a result, FSA management did not have reasonable assurance that servicers were complying with Federal loan servicing requirements when handling borrowers' inquiries, borrowers might not have been protected from poor services, and taxpayers might not have been protected from improper payments.

---

[4] FSA's contracts with the servicers allowed FSA to take certain actions, such as withholding payment or reducing loan volume, to hold servicers accountable when they failed to comply with Federal loan servicing requirements.

U.S. Department of Education
Office of Inspector General
ED-OIG/A05Q0008

2

## What We Recommend

We recommend that the Chief Operating Officer for FSA—

- track all instances of noncompliance identified during FSA oversight activities, regardless of whether servicers remediated the specific instances before FSA issues a final review report, and use the records to identify trends and recurring noncompliance for each servicer and across all servicers;

- use the contractual accountability provisions available, such as requiring the return of funds or reducing future loan volume, to hold servicers accountable for instances of noncompliance; and

- regularly share the results of any FSA loan servicing oversight activities with servicers.

## FSA Comments

FSA provided written comments on the draft of this report on November 2, 2018. FSA neither agreed nor disagreed with the findings but agreed with all six recommendations. It did not comment on the overall conclusion presented in this report. On November 20, 2018, the Deputy Chief Operating Officer for FSA notified OIG that FSA would revise its comments on the draft audit report.

On December 7, 2018, FSA provided its revised written comments. FSA strongly disagreed with the overall conclusion that it did not establish policies and procedures that provided reasonable assurance that the risk of servicer noncompliance with Federal requirements was mitigated. FSA also stated that it already had or will implement all six recommendations and described improvements it has made to its oversight activities since September 2017.

FSA stated that the wording of Finding 1 implies a much broader risk than indicated by the examples included in the report. It also disagreed that FSA rarely held servicers accountable, stating that enforcement actions since September 2017 have resulted in about $2 million in recommended recoveries. FSA stated no disagreement with Finding 2.

We include the full text of FSA's revised comments in the FSA Comments section at the end of this report. We also summarize FSA's revised comments at the end of each finding.

## OIG Response

Because the post-September 2017 improvements that FSA described in its comments did not occur during our audit period, we did not evaluate them and do not discuss

U.S. Department of Education
Office of Inspector General
ED-OIG/A05Q0008

3

them in this report. However, as described, the improvements are aligned with the recommendations in this report. Other than providing further emphasis that we based our overall conclusion and findings on an assessment of FSA's control activities as of September 2017, we did not make any changes to the report based on FSA's comments.

We acknowledge that reasonable assurance of risk mitigation is a matter of management's risk appetite and risk tolerance. However, FSA's revised comments did not explain, and FSA did not provide any evidence showing, the level of noncompliance that is acceptable to FSA management or the level of noncompliance that would compel FSA to take enforcement actions against a servicer. Without such policies, employees conducting FSA's oversight activities cannot consistently know when it would be appropriate to recommend servicers take actions beyond correcting the specific instances of noncompliance identified by FSA's review teams.

Further, we do not agree that the risk of servicer noncompliance as described in Finding 1 is not broad. From January 1, 2015, through September 30, 2017, 61 percent (210) of 343 reports on FSA's oversight activities identified instances of servicer noncompliance with Federal loan servicing requirements. These reports disclosed noncompliance by all nine servicers and recurring instances of noncompliance by some servicers. These instances included noncompliance with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection. In most cases, FSA only required servicers to correct the accounts of borrowers affected by the noncompliance specifically identified by FSA.

In most cases before October 2017, FSA did not take actions stronger than correcting the accounts of those affected by FSA-identified noncompliance; rarely did FSA require the servicer to conduct a full file review. FSA also rarely penalized servicers for recurring noncompliance. In the 5 years that ended September 2017, FSA had required only three servicers to return about $181,000 to FSA for four instances of failure to service loans in compliance with Federal loan servicing requirements. Additionally, FSA's methodology for assigning new loans to servicers was not adjusted to take into account servicers' compliance with Federal loan servicing requirements. Therefore, servicers with more frequent instances of noncompliance experienced no reduction in the amount of new loans that FSA assigned to them. Although FSA stated that enforcement actions since September 2017 have resulted in about $2 million in recommended recoveries, the amount represents less than 0.12 percent of $1.7 billion that FSA budgeted for its loan servicing contracts in 2018 and 2019. While increased use of enforcement actions by FSA aligns with our recommendation, it will be important for FSA to track all instances of noncompliance and to assess the effect that its increased enforcement actions have on reducing noncompliance by the servicers.

# Introduction

## Background

The U.S. Department of Education (Department) is the nation's largest provider of student financial aid for education beyond high school. Within the Department, FSA is responsible for servicing all loans originated through the William D. Ford Federal Direct Loan (Direct Loan) Program and Federal Family Education Loan (FFEL) Program loans purchased from nonfederal entities.[5] As of September 30, 2017, the outstanding federally held student loan debt was more than $1.1 trillion.

## Servicing Federally Held Student Loans

In 2009, FSA contracted with four servicers: (1) Great Lakes Educational Loan Services (Great Lakes); (2) Navient, LLC (Navient);[6] (3) Nelnet Servicing, LLC (Nelnet); and (4) Pennsylvania Higher Education Assistance Agency (PHEAA). From 2011 through 2013, FSA contracted with 11 more servicers: (1) Aspire Resources, Inc.; (2) College Foundation, Inc.; (3) Council for South Texas Economic Progress; (4) Educational Services of America, Inc. (EdFinancial Services); (5) Kentucky Higher Education Student Loan Corporation (Kentucky); (6) Missouri Higher Education Loan Authority (Missouri); (7) New Hampshire Higher Education Loan Corporation (New Hampshire); (8) Oklahoma Student Loan Authority (Oklahoma); (9) South Carolina Student Loan Corporation; (10) Utah Higher Education Assistance Authority (Utah); and (11) Vermont Student Assistance Corporation.[7] These 15 servicers have been responsible for collecting payments on federally held student loans that are not in a default status,[8] advising

---

[5] From September 2008 through September 2010, the Department purchased a portion of the outstanding FFEL program loans, as authorized under the Ensuring Continued Access to Student Loans Act of 2008 (Public Law 110-227). In this report, we refer to Direct Loan and the purchased FFEL loans as federally held student loans.

[6] In 2009, FSA contracted with SLM Corporation. In 2014, SLM Corporation split into two corporations; the second corporation—Navient, LLC—assumed the loan servicing responsibilities.

[7] As of September 2017, five of these 11 servicers (EdFinancial Services, Missouri, Oklahoma, New Hampshire, and Utah) were still servicing federally held student loans.

[8] A borrower who is more than 270 days delinquent in making payments is considered in a default status. However, FSA's policy is to not have the servicer transfer such loans to FSA's Default Management Collection System for assignment to a private collection agency until 360 days pass without payment being received.

borrowers on available resources to better manage their loan obligations, responding to borrowers' inquiries, and performing other administrative tasks associated with collecting and servicing federally held student loans on behalf of the Department.

The contracts with the servicers stated that: "The contractor(s) will be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur." The contracts also specified certain activities that servicers were required to address through their policies and procedures. For example, all the contracts required servicers to report financial and other information to FSA and provide FSA access to their loan servicing information. Additionally, the contracts with Great Lakes, Navient, Nelnet, and PHEAA required the servicers to provide the Department with a copy of any lawsuit within 10 days of the complaint being served.

The contracts with the servicers also stated that FSA will assign loans based on the performance of each servicer in relation to the other servicers (as determined twice a year). Since September 2014, FSA has assigned new loans to servicers by calculating performance scores based on five attributes. The five attributes (and corresponding weights) for calculating servicer performance scores were as follows:

- satisfaction surveys of borrowers (35 percent),

- percentage of borrowers who were not more than 5 days delinquent (30 percent),

- percentage of borrowers who were more than 90 days but less than 271 days delinquent (15 percent),

- percentage of borrowers who were more than 270 days but less than 361 days delinquent (15 percent), and

- satisfaction survey of FSA employees who interacted with the servicers (5 percent).

As of September 30, 2017, FSA was responsible for about $1.147 trillion of federally held student loans. Of the $1.147 trillion, about $1.026 trillion was assigned to servicers,[9] of which $950 billion (93 percent) was assigned to four servicers—PHEAA ($319 billion), Great Lakes ($236 billion), Navient ($215 billion), and Nelnet ($180 billion). FSA had

---

[9] About $120 billion (10 percent) of the $1.147 trillion in outstanding federally held student loan debt was in default. Defaulted loans were assigned to private collection agencies, not to servicers.

U.S. Department of Education
Office of Inspector General
ED-OIG/A05Q0008

6

assigned the remaining $76 billion (7 percent) to EdFinancial Services, Missouri, Oklahoma, New Hampshire, and Utah.

## Ensuring Servicer's Compliance with Requirements

FSA is responsible for ensuring servicers comply with all requirements for servicing federally held student loans, including requirements relevant to income-driven repayment plans, forbearances and deferments of loan payments, consolidations of loans, and principal and interest payments. Among the many requirements with which they must adhere, servicers must

- correctly record the borrowers' interest rates and calculate the borrowers' balances;

- correctly apply payments to borrowers' accounts;

- properly grant forbearances and deferments to borrowers;

- appropriately capitalize loan interest;

- follow guidelines for delinquency notice letters, telephone calls, and skip tracing activities as they pertain to the collection of loans;

- properly process borrowers' applications for income-driven repayment plans;

- correctly calculate borrowers' monthly payments under income-driven repayment plans; and

- maintain complete and accurate records to support borrower's repayment plans.

See Appendix C for a list of significant Federal laws and regulations with which servicers must comply.

Employees from three FSA offices—Business Operations, Program Compliance, and Finance—performed oversight activities that FSA management established to provide reasonable assurance that servicers complied with the requirements for servicing federally held student loans. These procedures included

- listening to recorded telephone interactions between servicer representatives and borrowers,

- conducting reviews of servicers' compliance with loan servicing requirements,

- reviewing independent auditors' reports on audits of servicers' systems of internal control,

- meeting with servicers, and

- conducting surveys of borrowers and FSA employees.

For a description of these oversight activities , see Appendix B.

## Finding 1. FSA Did Not Track All Identified Instances of Noncompliance and Rarely Held Servicers Accountable for Noncompliance with Requirements

FSA

- did not track all instances of noncompliance that FSA identified during its oversight activities,

- did not analyze the records relevant to identified instances of noncompliance to identify trends and recurring noncompliance for each servicer and across all servicers,

- rarely used available contract accountability provisions to hold servicers accountable for instances of noncompliance, and

- did not incorporate a performance metric relevant to servicer compliance with Federal requirements into its methodology for assigning loans to servicers.

As a result, borrowers might not have received the most favorable repayment terms available to them, and servicers might have been paid more than they should have been under their contracts.

### FSA Did Not Track All Information Necessary to Identify Trends in Servicer Noncompliance with Federal Requirements

FSA used a database to track instances of servicer noncompliance with Federal loan servicing requirements. The database included instances of servicer noncompliance that required further action to be taken by either the servicer or FSA.

However, the database did not include instances of noncompliance that FSA identified during its review but considered the actions that the servicer proposed to be sufficient to remedy the specific instance of noncompliance. For example, an April 2017 report on a servicer liaison team review of EdFinancial Services' inbound and outbound calls disclosed that servicer representatives did not always provide interest capitalization information to borrowers. EdFinancial Services agreed to take the action as recommended by FSA; therefore, according to FSA's practice, the instances of noncompliance were not recorded in FSA's database.

In addition to the information in the database being incomplete, FSA management was not using the information it did have to identify trends and recurring noncompliance for each servicer and across all servicers. Instead, FSA relied on the memories of the

000015

employees responsible for the oversight activities to recognize recurring instances of noncompliance.

We concluded that FSA had the information needed to identify recurring instances of and trends in noncompliance. We analyzed all 343 monitoring reports that FSA completed from January 1, 2015, through September 30, 2017. The 343 reports included those on FSA's monitoring of calls between servicer representatives and borrowers (73 reports), reviews of servicers' compliance with Federal requirements (210 reports), and reviews of independent auditors' reports on audits of servicers' systems of internal control (60 reports).[10] About 61 percent (210) of these reports disclosed instances of servicer noncompliance with various areas of Federal loan servicing requirements. These instances included noncompliance with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection. The reports disclosed recurring instances of noncompliance primarily in two areas: consumer protection (servicer representatives not informing borrowers of the available repayment options) and income-driven repayment (servicers incorrectly calculating income-driven payment amounts). The reports also disclosed that the noncompliance rates at some servicers were significantly higher than the average noncompliance rate of all servicers.

### Servicer Representatives Not Sufficiently Informing Borrowers of Available Repayment Options

When a servicer is notified that a borrower is having difficulty making payments, the servicer is required to provide the borrower with information about her or his options for avoiding default status.[11] The servicer must explain the repayment plans available to the borrower. The servicer also must explain how the borrower may request a change in her or his repayment plan, provide the borrower with a description of the requirements for obtaining forbearance on the loan and any costs associated with forbearance, and provide the borrower with a description of the options available to avoid default and any fees or costs associated with those options. From January 2015 through September 2017, monthly reports on FSA's monitoring activities disclosed recurring instances at all servicers of servicer representatives not sufficiently informing borrowers about available repayment options.

---

[10] For a description of these control activities, see Appendix B.

[11] Title 34, Code of Federal Regulations (C.F.R.), § 682.205(a)(4). Where there was no comparable Direct Loan regulation, the FFEL program regulation was effective.

Monthly, FSA listened to a sample of recorded telephone calls between servicer representatives from all nine servicers and borrowers. For each call, FSA call monitors completed a scoresheet. FSA failed all calls receiving a score under FSA's established standard.[12] From January 2015 through September 2017, FSA provided 73 monthly reports on individual servicers. Nearly 92 percent (67) of the monthly reports included at least 1 instance of the servicer representative not sufficiently informing borrowers about available repayment options. For the April 2017 reports, FSA listened to 4,440 telephone calls. The monthly reports showed that FSA failed 193 calls (4.3 percent of the 4,440 calls). Of those failed calls, FSA failed 26 percent (50 calls) because the servicer representatives did not provide the borrowers with sufficient information about the repayment options available to them. The failed-call rates for two servicers (Utah, 8.9 percent, and PHEAA, 10.6 percent) were significantly higher than the 4.3 percent average failed-call rate for all servicers (see Table 1).

**Table 1. April 2017 Calls That FSA Monitored and Failed**

| Servicer | Number of Calls Evaluated | Number of Calls That Failed | Percentage of Calls That Failed | Number Failed Because Borrower Not Provided Sufficient Information |
|---|---|---|---|---|
| Utah | 158 | 14 | 8.9 | 2 |
| EdFinancial Services | 492 | 15 | 3.0 | 4 |
| PHEAA | 997 | 106 | 10.6 | 25 |
| New Hampshire | 261 | 3 | 1.1 | 2 |
| Great Lakes | 206 | 3 | 1.5 | 3 |
| Missouri | 568 | 29 | 5.1 | 9 |
| Navient | 834 | 6 | 0.7 | 2 |
| Nelnet | 466 | 7 | 1.5 | 2 |
| Oklahoma | 458 | 10 | 2.2 | 1 |
| Total | 4,440 | 193 | 4.3 | 50 |

---

[12] See Appendix B. FSA's Oversight Activities, Call Monitoring Team Reviews.

U.S. Department of Education
Office of Inspector General
ED-OIG/A05Q0008

11

000017

For the May 2017 reports on FSA's call monitoring, FSA listened to 6,070 telephone calls between servicer representatives from all 9 servicers and borrowers. The monthly reports showed that FSA failed 151 calls (2.5 percent of the 6,070 calls). Of those failed calls, FSA failed 20 percent (30 calls) because the servicer representatives did not provide the borrowers with sufficient information about the repayment options available to them. The failed-call rates for two servicers (Missouri, 4.9 percent, and PHEAA, 8.8 percent) were significantly higher than the 2.5 percent average failed-call rate for all servicers (see Table 2).

Table 2. May 2017 Calls That FSA Monitored and Failed

| Servicer | Number of Calls Evaluated | Number of Calls Failed | Percentage of Calls Failed | Number Failed Because Borrower Was Not Provided Sufficient Information |
|---|---|---|---|---|
| Utah | 735 | 11 | 1.5 | 1 |
| EdFinancial Services | 481 | 4 | 0.8 | 0 |
| PHEAA | 853 | 75 | 8.8 | 8 |
| New Hampshire | 488 | 5 | 1.0 | 1 |
| Great Lakes | 369 | 11 | 3.0 | 7 |
| Missouri | 699 | 34 | 4.9 | 9 |
| Navient | 1,112 | 3 | 0.3 | 0 |
| Nelnet | 871 | 6 | 0.7 | 4 |
| Oklahoma | 462 | 2 | 0.4 | 0 |
| Total | 6,070 | 151 | 2.5 | 30 |

From January 2015 through September 2017, FSA issued 5 other reports (4 on reviews conducted by the servicer liaison team and 1 on a review conducted by Financial Institution Oversight Service) that covered the area of consumer protection.[13] Of the

---

[13] During this period, FSA issued 33 reports on reviews conducted by the servicer liaison team and 25 reports on reviews conducted by Financial Institution Oversight Service.

000018

five reports, three identified instances of servicer representatives not sufficiently informing borrowers about available repayment options.

The April 2017 report on a servicer liaison team review of EdFinancial Services' inbound and outbound calls disclosed that servicer representatives did not always provide interest capitalization information to borrowers. The servicer representatives provided interest capitalization information when discussing a forbearance or deferment but not when discussing different repayment plans.

The May 2017 report on a servicer liaison team review of Navient's call center disclosed that servicer representatives did not offer alternative or potentially beneficial options when attempting to assist borrowers with bringing their account current or managing repayment. Instead, Navient representatives placed the borrowers' accounts into forbearance statuses.[14] For this review, FSA listened to 2,388 calls and determined that, for 220 calls (9.2 percent), servicer representatives did not provide the borrowers with all of their available repayment options. Navient offered only forbearance as an option during all 220 calls. The 9.2 percent rate of noncompliance was significantly higher than the 0.3 percent rate disclosed in FSA's failed-call report for the same month.

The May 2017 report on a review conducted by Financial Institution Oversight Service disclosed that PHEAA representatives placed borrowers' accounts into forbearance statuses to resolve delinquencies without discussing all available options with the borrowers. For this review, FSA listened to 99 borrower calls. It determined that, for 24 (24.2 percent) of the 99 calls, servicer representatives did not provide the borrowers with sufficient information regarding their available options. PHEAA granted forbearances to 17 borrowers when they might have benefitted from a different option, such as possible deferment or income-driven repayment. PHEAA either provided the other seven borrowers with inaccurate information regarding their options or did not follow internal procedures regarding the order of delinquency resolution options. The 24.2 percent rate of noncompliance was additional evidence (to the 8.8 percent rate disclosed in the failed-call report for the same month) of a pattern of noncompliance at PHEAA.

### Income-Driven Payment Amounts Not Correctly Calculated

Income-driven repayment plans set a borrower's monthly payment at an amount that is intended to be affordable based on the borrower's income and family size. Any errors in

---

[14] Forbearance status results in a temporary cessation of the borrower's required payment, providing the borrower an extension of time for making payments or to temporarily make smaller payments than previously scheduled. However, interest continues to accrue on the borrower's account.

000019

the calculation of the affordable payment amounts could negatively affect borrowers or taxpayers. From January 2015 through September 2017, reports on FSA's monitoring activities (Financial Institution Oversight Service reviews, process monitoring team reviews, servicer liaison reviews, and reviews of audit reports on servicers' systems of internal control) disclosed recurring instances of servicers not correctly calculating borrowers' monthly payment amounts under income-driven repayment plans. FSA identified such noncompliance at seven servicers—at four more than once.

From January 2015 through September 2017, FSA issued 25 reports on reviews conducted by Financial Institution Oversight Service, 152 reports on reviews conducted by the process monitoring team, and 33 reports on reviews conducted by the servicer liaison team. These 210 reports disclosed the following:

- Twenty-two of the 25 Financial Institution Oversight Service reviews covered the calculation of income-driven repayment amounts. Five (23 percent) of those 22 reviews disclosed instances of servicers not correctly calculating borrowers' repayment amounts.

- Ten of the 152 process monitoring team reviews covered the calculation of income-driven repayment amounts. Two (20 percent) of the 10 reviews disclosed instances of servicers not correctly calculating borrowers' repayment amounts.

- Nine of the 33 servicer liaison team reviews covered the calculation of income-driven repayment amounts. Six (67 percent) of the 9 reviews disclosed instances of servicers not correctly calculating borrowers' repayment amounts.

In total, 13 (32 percent) of the 41 reports on FSA reviews that covered the calculation of income-driven repayment amounts disclosed instances of servicers not correctly calculating borrowers' repayment amounts.

In addition to its own reviews, FSA reviewed independent auditors' reports on audits of servicers' systems of internal control, tracked the instances of noncompliance disclosed in those reports, and considered the noncompliance during planning for FSA's following year's compliance review work. Reports on 60 audits of servicers' systems of internal control that FSA reviewed from January 1, 2015, through September 30, 2017, disclosed that 1 servicer did not correctly calculate the income-driven monthly payment amounts during 2 consecutive audit periods. The report on the Utah audit covering July 1, 2016, through December 31, 2016, disclosed that Utah incorrectly calculated the payment amounts for 2 of 45 borrower accounts. The report on the Utah audit covering January 1, 2017, through June 30, 2017, disclosed that Utah incorrectly calculated the payment amounts for 6 of 45 borrower accounts.

## Contractual Accountability Provisions Rarely Used

FSA provided us with evidence of only four instances, affecting three servicers, in the past 5 years in which it required a servicer to return funds to the Federal government for failure to service loans in compliance with Federal requirements. In 2013, FSA reduced payments to Great Lakes by $99,836 because the servicer improperly billed FSA for borrower accounts placed in administrative forbearance. Great Lakes automatically placed delinquent accounts in administrative forbearance, which did not comply with the forbearance requirements. In 2017, FSA reduced payments to Great Lakes by $1,260, New Hampshire by $37,438, and Oklahoma by $42,550 because the three servicers did not comply with the requirements of an interest rate reduction program. FSA has not adjusted the number of new loans assigned to a servicer or transferred a noncompliant servicer's current loan volume to another servicer because of a servicer's noncompliance with Federal loan servicing requirements.

FSA's contracts with all servicers state that the servicers are required to follow all applicable Federal laws and regulations, or they will be required to return any fees that they billed to the Department from the time of noncompliance. The "Invoicing and Non-Compliance" section of every servicer's contract states the following:

> Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (i.e. correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), will not be billable to the Government from the initial point of non-compliance. Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

According to the contracts, servicers are responsible for all supplies, services, and other costs to service borrower accounts. This includes costs for bringing contractor systems into compliance for handling federally held debt and costs for legislative, regulatory, or policy changes that affect the servicing of borrower accounts. For all other costs, the Department and the servicer may come to an agreement via change order process or negotiation, as necessary.

All contracts also allowed FSA to penalize the servicers for noncompliance by reallocating new loan volume to other servicers or transferring all or part of the noncompliant servicer's current loan volume to another servicer until the noncompliant servicer comes back into compliance. Servicers bill the Department for each individual borrower account serviced. The billing amount is based on the number of borrower accounts serviced (a set amount per account) and the status of each borrower account.

000021

The contracts include a pricing structure for in-school, grace or repayment, deferment or forbearance, and delinquent borrower account statuses.

As of September 2017, FSA's methodology for assigning new loans to servicers did not take into account servicers' compliance with Federal loan servicing requirements or FSA's requirements for servicer representatives' interactions with borrowers. Servicers with more instances of noncompliance experienced no reduction in the amount of new loans that FSA assigned to them, even though some borrowers might be experiencing poor service. All contracts required FSA to assign loans based on the performance of each servicer in relation to each of the other servicers (as determined two times a year). Since September 2014, FSA has assigned new loans to servicers by calculating servicer performance scores based on the following five attributes and weights:

- satisfaction surveys of borrowers (35 percent),

- percentage of borrowers who were not more than 5 days delinquent (30 percent),

- percentage of borrowers who were more than 90 days but less than 271 days delinquent (15 percent),

- percentage of borrowers who were more than 270 days but less than 361 days delinquent (15 percent), and

- satisfaction survey of FSA employees who interacted with the servicers (5 percent).

None of the contracts allowed FSA to establish performance metrics relevant to each servicer's compliance with loan servicing requirements and evaluate individual servicer's performance against such performance metrics.

## Agencies Should Evaluate and Modify Control Activities

"Standards for Internal Control in the Federal Government" states that management should design appropriate types of control activities to address risks, including those risks relevant to service organizations. The standards also state that management retains responsibility for monitoring the effectiveness of internal control over the assigned processes performed by service organizations and should hold service organizations accountable for their assigned internal control responsibilities. When issues are identified, management should evaluate them to determine whether any of the issues rise to the level of an internal control deficiency. Management should consider whether current controls address the identified issues and modify controls, if necessary. Management should also determine appropriate corrective actions and oversee remediation of deficiencies.

In addition to the standards for internal control, FSA's own strategic plan emphasizes that FSA's control activities should focus on ensuring that servicers fulfill their responsibilities. FSA's strategic plan for fiscal years 2015–2019 included a strategic goal to "Proactively manage the student aid portfolio to mitigate risk." One of FSA's objectives for this goal stated: "This will include the implementation of processes, tools, and methods that serve to protect the interests of students, and support FSA in making service providers accountable." The objective further stated that FSA would "ensure that its processes for resolving student issues are simple for customers to use and sophisticated enough to capture insights that can be used to refine student aid operations."

### The Harm of Not Holding Servicers Accountable for Compliance with Federal Requirements

In its 2007 report on proposed amendments to the Higher Education Act, the Senate Committee on Health, Education, Labor, and Pensions stated: "[t]he committee believes strongly that lenders, guaranty agencies and institutions of higher education must act with honesty and integrity at all times to ensure that the financial aid programs under title IV serve the best interests of students." In its December 2007 report on the Higher Education Opportunity Act of 2008, the House of Representatives Committee on Education and Labor stated: "[t]he nation's financial aid system exists for a single purpose: to serve students and their families."

By rarely holding servicers accountable for instances of noncompliance with Federal loan servicing requirements, FSA is not providing servicers with incentive to take actions to mitigate the risk of continued noncompliance that harms students and their families. Failure by servicers to take appropriate corrective actions could lead to borrowers not receiving the most favorable repayment terms that should have been available to them. Additionally, FSA's not holding servicers accountable could lead to servicers being paid more than they should be (the contracts with servicers allow FSA to recover amounts paid for loans not serviced in compliance with requirements).

By not holding servicers accountable, FSA could give its servicers the impression that it is not concerned with servicer noncompliance with Federal loan servicing requirements, including protecting borrowers' rights.

000023

## Recommendations

We recommend that the Chief Operating Officer for FSA—

1.1 Track all instances of noncompliance identified during FSA reviews, regardless of whether the specific instances were corrected and did not require further action to be taken by either the servicer or FSA.

1.2 Analyze the records relevant to noncompliance, identify trends and recurring noncompliance for each servicer and across all servicers, and use the information as a basis for assessing servicer performance.

1.3 Use the contractual accountability provisions available, such as requiring the return of funds or reducing future loan volume, to hold servicers accountable for instances of noncompliance.

## FSA Comments

FSA disagreed with certain aspects of the finding (see FSA Comments). FSA stated that the wording of the finding implies a much broader risk than indicated by the examples described. According to FSA, it devotes significant resources to its servicer oversight and monitoring efforts. FSA and third parties, including the OIG, conduct regular audits of servicers' internal control processes. Neither Finding 1 nor these oversight activities have identified material instances of servicer noncompliance. FSA also disagreed that it rarely held servicers accountable for identified instances of noncompliance, stating that, since September 2017, it has required servicers to return more than $2 million for noncompliance.

FSA also provided its explanation regarding the servicer liaison team review of Navient's call center (see page 13 of this report). FSA stated that the review was part of a larger review initiated by FSA in response to a lawsuit filed against Navient by the Consumer Financial Protection Bureau. FSA stated that the review only targeted short-duration calls because those would most likely include improper use of forbearances. According to FSA, the review team concluded that Navient was not improperly steering borrowers into forbearance, and nothing in the review report indicated that Navient improperly applied forbearances. FSA further stated that the review supports a conclusion that Navient followed standard practice and acted consistent with the requirements of its contract.

Finally, FSA stated that it has made improvements to its oversight and monitoring policies and procedures since the end of the audit period (September 2017). According to FSA, some of the improvements align with the recommendations of this report. FSA asked that we revise the report to reflect these improvements.

## OIG Response

We did not revise the finding based on FSA's comments. We agree that FSA devotes significant resources to its oversight activities. However, we disagree with FSA's statement that the risk of servicer noncompliance is not broad. As stated in this finding, from January 1, 2015, through September 30, 2017, 61 percent (210) of 343 reports on FSA's servicer oversight activities identified instances of servicer noncompliance with Federal loan servicing requirements. These reports disclosed noncompliance by all nine servicers and recurring instances of noncompliance by some servicers. These instances included failure to comply with requirements relevant to forbearances, deferments, income-driven repayment, interest rates, due diligence, and consumer protection. FSA usually concluded that the error rate was low (1, 2, or 3 instances of noncompliance in a sample of about 30 borrower accounts) and did not expand its samples of borrower accounts or require the servicer to conduct a review to determine the extent of the noncompliance. Instead, FSA only required the servicer to correct the borrower accounts that FSA identified as in error.

However, the noncompliance that FSA has repeatedly identified could affect a much larger population of borrowers than those specifically identified by FSA's reviews of samples of borrower accounts. Those risks include increased interest or repayment costs incurred by borrowers, the missed opportunity for more borrowers to take advantage of certain repayment programs, negative effects on borrowers' credit ratings, and an increased likelihood of delinquency or even default.

Our audit evaluated FSA's control activities as of September 2017, and we found that FSA's control activities disclosed instances of noncompliance across all servicers and recurring instances of noncompliance at some servicers. Those results suggest that a more concerted effort to enforce accountability on the part of servicers is necessary. The approximately $2 million in recommended recoveries since September 2017 that FSA described in its comments represents a significant increase in recommended recoveries during the 5 years ended September 2017. However, $2 million represents less than 0.12 percent of the approximately $1.7 billion that FSA budgeted for loan servicing contracts in fiscal years 2018 and 2019. While increased use of enforcement actions by FSA aligns with our recommendation, it will be important for FSA to track all instances of noncompliance and to assess the effect that its increased enforcement actions have on reducing noncompliance by the servicers.

FSA's explanation of its conclusions regarding the Navient review did not cause us to change our discussion of FSA's May 2017 review report. The report did not state that Navient improperly or properly steered borrowers into forbearance. Instead, the report stated that Navient used forbearances instead of sufficiently informing borrowers about available repayment options. FSA's review report stated:

> For 220 of the calls, Navient [Customer Service Representatives]
> neglected to offer the borrower an option other than forbearance. . .
> While this isn't a contractual requirement, these borrowers were not
> given the opportunity to decide if another option (like one of the
> Income Driven plans or a deferment) would have been more favorable.
> And in some instances, interest was capitalized when another option
> may have prevented it.

FSA's comments do not change the finding of the May 2017 report that Navient did not always notify borrowers of their repayment options. The report's finding could still have been used to identify noncompliance rates at one servicer that were higher than the average noncompliance rate of all servicers.

Because the post-September 2017 improvements that FSA described in its comments did not occur during our audit period, we did not evaluate them and do not discuss them in this report. However, the described improvements are aligned with the recommendations for Finding 1.

000026