# EXHIBIT D

October 2017

# Annual report of the CFPB Student Loan Ombudsman

Strategies for consumer-driven reform



cfpb   Consumer Financial Protection Bureau

# Table of contents

# Table of contents

Executive summary..........................................................................................2

1. About this report.......................................................................................6

2. Student loan complaint data....................................................................7
   2.1 Federal student loan complaints ....................................................7
   2.2 Private student loan complaints ................................................... 18
   2.3 Debt collection complaint data..................................................... 26

3. Ombudsman's discussion .......................................................................33

4. Recommendations..................................................................................63

5. Contact information...............................................................................67

# Executive summary

- Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, this annual report analyzes complaints submitted by consumers between September 1, 2016 and August 31, 2017. During this period, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") handled approximately 12,900 federal student loan servicing complaints, 7,700 private student loan complaints, and approximately 2,300 debt collection complaints related to private or federal student loan debt.

- During the reporting period, consumers with student loans submitted complaints about more than 250 companies, including student loan servicers, debt collectors, private student lenders, and companies marketing student loan "debt relief." These consumers identified a range of payment processing, billing, customer service, borrower communications, and income-driven repayment (IDR) plan enrollment problems. The Bureau's analysis of these complaints suggests that borrowers assigned to the largest student loan servicers may encounter widespread problems, whether these borrowers are trying to get ahead or struggling to keep up with their student debt.

- Since 2012, the Bureau has handled complaints from individual student loan borrowers, and the CFPB Student Loan Ombudsman has monitored these complaints. Each year, reports by the Student Loan Ombudsman emphasize the individual challenges borrowers identify in their complaints. These reports also highlight where challenges may be systemic in nature and illustrate where law enforcement, regulatory action, or market-driven reform may be necessary to better protect similarly situated student loan borrowers.

- From July 21, 2011 through August 31, 2017, CFPB handled over 50,700 private and federal student loan complaints, and about 9,800 debt collection complaints related to private or federal student loan debt. These complaints have served as the critical link in a process through which government agencies and market participants have repeatedly taken action to

improve the student loan system for millions of Americans. In effect, these complaints have led to actions that have collectively returned more than $750 million to student loan borrowers.

- This report offers three illustrative examples of how an effective consumer complaint process can empower individual consumers to shape public policy. The report describes how consumer complaints led to reforms that expanded invocation of protections through automation; improved borrower outcomes through enhanced, timely, and accurate borrower communication; and mitigated risk of unanticipated borrower harm by spurring industry to make changes to key loan terms.

  - In the first example, servicemembers with student loans submitted complaints to the Bureau that described servicing practices that inhibited access to a specific consumer protection established under the federal Servicemember Civil Relief Act (SCRA). In 2012, the Student Loan Ombudsman and the Bureau's Office of Servicemember Affairs described the obstacles servicemembers were facing in a public report and also shared these complaints with other federal agencies. These complaints informed enforcement actions by the Department of Justice (DOJ) and the Federal Deposit Insurance Corporation (FDIC), which halted illegal practices at one large student loan servicer and returned more than $60 million to 77,000 servicemembers. Following this action, the Department of Education improved processes for the invocation of specific consumer protections under the SCRA to better protect federal student loan borrowers serving on active duty. As a consequence of this coordinated interagency work, more than 100,000 military borrowers have automatically saved more than $20 million in student loan interest charges each year since 2015. This example offers insight into the benefits of automation-driven reform as policymakers seek to strengthen many other aspects of the student loan repayment process.

  - In the second example, borrowers seeking to enroll in IDR plans submitted complaints to the Bureau describing a range of servicing practices that delayed or deterred access to promised payment relief. The Student Loan Ombudsman published a report recounting these problems and, in 2016, the Bureau's Office of Supervision cited one or more student loan servicers for the unfair practice of "denying, or failing to approve, IDR applications that should have been approved on a regular basis." The Department of Education's Office of Federal Student Aid (FSA) also responded to concerns related to IDR application processing in 2016 by strengthening its contractual requirements for

    servicers handling student loans owned by the federal government by requiring these servicers to proactively communicate with student loan borrowers who submit incomplete IDR applications. Since these changes, more than 700,000 new federal Direct Loan borrowers have successfully applied for and enrolled in an IDR plan. This example may be instructive before considering steps to "streamline" repayment assistance options by limiting the range of benefits and protections available to consumers with student debt. Clear, plain language disclosures and "just-in-time" communication about available and applicable options can simplify the presentation of information and strengthen the student loan repayment process.

- The final example illustrates where borrower complaints can expose an industry practice that harms consumers and, at the same time, does not serve an essential market function. In this example, individual consumers submitted complaints about private student loan "auto defaults" – the process of calling into default and attempting to collect on a private student loan following the death of, or bankruptcy filing by, a cosigner, even when the borrower is making required payments on time and in full each month. Subsequently, the Bureau's Office for Supervision cited the practice of auto-defaulting private student loan borrowers to be unfair in cases where the where the "Whole Loan Due" clause was ambiguous. Ultimately, the largest private lenders have largely ceased including provisions in their new contracts that could be interpreted to permit "auto-defaults" for performing loans and abandoned this practice with respect to their current customers. As policymakers consider reforms that may expand the private student loan market, this example illustrates how features of private student lending can present potential risks to consumers, and how complaints and robust oversight can move the market to mitigate risk of unanticipated borrower harm through consumer-driven reforms to product features.

- In each of the previous three examples, individual consumer complaints led to increased scrutiny by regulators or law enforcement agencies with the authority, tools, and will to take action on behalf of these borrowers after these complaints were highlighted by the Student Loan Ombudsman. These examples provide a roadmap for policymakers to achieve additional consumer-driven reforms and illustrate how individual borrowers can shape changes to government policies and industry practices.

- This report also offers recommendations to policymakers and market participants. In this section, the CFPB Student Loan Ombudsman describes how student loan borrowers benefit

from continued robust, coordinated, and consumer-driven oversight of the student loan industry by federal and state agencies. Further, this report recommends standards to strengthen servicing practices for the servicing of all student loans and accountability for servicers to meet these standards.

000114

# 4. Recommendations

Policymakers and market participants may wish to consider the following recommendations to address the specific issues identified in this report.

## Student loan borrowers benefit from robust, coordinated, and consumer-driven oversight of the student loan industry by federal and state agencies.

In each of the preceding examples, the regulators and law enforcement agencies responsible for providing oversight over student loan companies used consumer complaints to inform and shape this oversight. These consumer complaints revealed systemic issues that informed supervisory and enforcement actions that ultimately ended harmful industry practices and halted violations of law across the student loan industry. Subsequently, policy changes and market shifts led to protections for a broader segment of student loan borrowers.

FIGURE 10:   BORROWERS BENEFIT WHEN COMPLAINTS INFORM CONSUMER-DRIVEN OVERSIGHT



Consumer-driven oversight sits at the nexus between consumer complaints and systemic reform. Borrowers benefit from five key features of this process, each of which depends on specific actions by agencies responsible for oversight. Borrowers benefit when 1) they are empowered to submit complaints to agencies with supervisory and/or enforcement authority; 2) servicers are subject to routine examinations informed by information about the experiences of borrowers; 3) agencies responsible for oversight have the necessary tools and authority to take action to halt harmful practices; 4) agencies share critical information about problems and

practices across the community of government entities responsible for oversight, regulation, and law enforcement in this market; and 5) public policy is shaped by information identified through this oversight.

Consumers benefit when the student loan industry is subject to coordinated oversight by regulators at both the federal and state levels. As the Bureau has noted in the past, a robust state-federal partnership offers tangible benefits to student loan borrowers by providing rigorous oversight in every corner of the student loan servicing market, both through analysis of data leading to recommendations for better practices, and where the knowledge and insights from oversight inform federal and state policymaking.[128]

## Student loan borrowers would benefit from standards to strengthen servicing practices for the servicing of all student loans and to have servicers held accountable for meeting these standards.

For more than five years, the Bureau has worked with federal and state agencies, law enforcement officials, and other stakeholders to assist individual borrowers and to address a wide range of harmful or illegal practices in the $1.4 trillion student loan market.[129] In conjunction with this work, the Bureau has also documented how student loan borrowers would be well served by industrywide standards for quality service that cover all types of student loans.[130] Policymakers, regulators, and law enforcement officials seeking to improve the student loan repayment process may draw on the approaches outlined above when seeking to set and

---

[128] *See* CFPB, *Prepared Remarks of Seth Frotman Before the California State Senate Banking and Financial Institution Committee* (Mar. 22, 2017), http://files.consumerfinance.gov/f/documents/201703_cfpb_Frotman-Testimony-CA-Senate-Banking-Committee.pdf; *see also* State of Connecticut Department of Banking, *Response to CFPB Request for Information on Student Loan Servicing* (July 13, 2015), https://www.regulations.gov/document?D=CFPB-2015-0021-0381.

[129] *See* Section three.

[130] *See* CFPB, *Student Loan Servicing* (Sept. 2015), http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf.

000173