## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, | |
| Plaintiff, | Civil Action No. 3:18-cv-1114 (MPS) |
| v. | |
| JORGE L. PEREZ, in his official capacity as Commissioner of the Connecticut Department of Banking, | |
| CONNECTICUT DEPARTMENT OF BANKING, | |
| BETSY DEVOS, in her official capacity as Secretary of the United States Department of Education, | |
| and | |
| UNITED STATES DEPARTMENT OF EDUCATION, | |
| Defendants. | |

## STATEMENT OF INTEREST OF THE UNITED STATES

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

    I.    The Federal Government Owns Trillions of Dollars in Student Loans and Is Highly Involved in Regulating Their Servicing.......................................... 2

    II.   Connecticut Has Also Sought to Regulate Student Loan Servicers by Imposing a Licensing Requirement and Broad Disclosure Requirements. ................... 5

DISCUSSION ..................................................................................................... 8

    I.    Connecticut's Entire Licensing Scheme Is Preempted by Federal Statutes and Regulations Governing the Selection of Contractors.............................. 10

        A.    Connecticut's Licensing Scheme Conflicts with Federal Statutes and Regulations Governing Education's Selection of Contractors......................... 10

        B.    Connecticut's Licensing Scheme Is also Barred by the Intergovernmental Immunity Doctrine. ...................................................................... 14

    II.   The Disclosure Requirements in Connecticut Law that Underlie Connecticut's Demands for Records Are Preempted Because They Conflict with the Privacy Act and the Servicers' Contracts with Education. ................................... 17

        A.    Connecticut's Disclosure Provisions Would Require Servicers to Violate the Privacy Act. .......................................................................... 18

        B.    Connecticut's Disclosure Provisions Would Require Servicers to Violate Their Contracts with Education......................................................... 24

        C.    The Events of this Case Typify the Conflict Between Connecticut Law and Federal Law. ......................................................................... 25

CONCLUSION.................................................................................................. 27

## INTRODUCTION

The United States respectfully submits this brief pursuant to 28 U.S.C. § 517.[1]  The United

States has a substantial interest in, and a long history of, helping students access postsecondary

education.  For decades, the United States has sought to increase access to higher education by

managing trillions of dollars of student loans—including both loans originated by the Federal

Government and loans the Federal Government purchased from private lenders—and establishing

other federal programs to aid students.  To manage federally-owned student loans, the Department

of Education (Education) selects, contracts with, and supervises loan servicers.  Education works

closely with these servicers to ensure that they are meeting its needs, protect the federal fisc, and

ensure compliance with applicable laws, including the Privacy Act, which governs the disclosure

of certain personally identifiable information contained in federal systems of records.

Connecticut has taken upon itself to also regulate student loan servicers, including those

servicing federally-owned and federally managed student loans (the majority of student loans).

*see generally* Conn. Gen. Stat. §§ 36a-846 to 36a-854.  Connecticut's laws are preempted to the

extent that they impose a licensing requirement on servicers with respect to their servicing of

---

[1] "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States." 28 U.S.C. § 517.  Federal Defendants maintain their objection to their presence in this case as defendants on sovereign immunity grounds.  *See* Fed. Defs.' Resp. Re: Subj. M. Juris., ECF No. 69.

As Education is filing a Statement of Interest rather than a motion for summary judgment, it does not provide a statement of undisputed facts or a separate response to the other parties' statements of undisputed facts.  However, Education does note that Connecticut at times incorrectly characterizes the application of the Privacy Act. *E.g.* State Defs.' Local Rule 56(a)1 Statement ¶ 34.  Furthermore, although Education's response to Connecticut's request is not at issue in this lawsuit, Connecticut incorrectly characterizes that response. *E.g.* State Defs.' Local Rule 56(a)1 Statement ¶ 46.

federally managed student loans because it is the Federal Government's prerogative to select its own contractors. Connecticut's broad disclosure requirements for licensed servicers are further preempted because they conflict with the Privacy Act and with the provisions of Education's contracts with its servicers, which require confidentiality. Accordingly, servicers cannot be compelled to comply with a preempted state law.

## BACKGROUND

**I.   The Federal Government Owns Trillions of Dollars in Student Loans and Is Highly Involved in Regulating Their Servicing.**

The Federal Government, through Education, plays an important role in making higher education accessible to students, including by making and facilitating loans to student and parent borrowers. *See generally* Higher Education Act of 1965, as amended (HEA), Pub. L. No. 89-329, 79 Stat. 1219 (codified as amended at 20 U.S.C. § 1001 *et seq.*).

There are three types of federal student loans: (1) Direct Loans, issued by the Federal Government under the William D. Ford Federal Direct Loan Program, 20 U.S.C. § 1087a *et seq.*, and therefore owned by the Federal Government *ab initio*; (2) FFELP loans issued by private lenders and non-profits and guaranteed by the Federal Government under the Federal Family Education Loan Program (FFELP), 20 U.S.C. § 1071 *et seq.*[2]; and (3) Perkins Loans, 20 U.S.C. § 1087aa. The Federal Government own and manages at least some of each of these three types of loans. Direct Loans are necessarily owned by the Federal Government. The Federal Government has also acquired many FFELP loans, either by purchasing them from private lenders, *see* Ensuring Continuing Access to Student Loans Act of 2008, § 7, Pub. L. No. 110-227, 122 Stat.

---

[2] No new FFELP loans have been issued since the SAFRA Act was passed in 2010, Pub. L. No. 111-152, 124 Stat. 1029 § 2201 (2010), although many FFELP loans remain outstanding.

740 (May 7, 2008) (amending 20 U.S.C. §§ 1087a, i), or by making reinsurance payments on

defaulted FFELP loans, *see* 20 U.S.C. § 1078(c).  And the Federal Government owns some Perkins

Loans, while others are owned by educational institutions.  20 U.S.C. § 1087aa.  All told, the

current value of all outstanding federal student loans is $1.481 trillion,[3] and more than $1.296

trillion of that amount comprises federally managed loans that are owned or held by the Federal

Government.[4]  In Connecticut alone, Education contracts for the servicing of approximately $ 13.7

billion in federal student loans managed and held by Education.  Declaration of Barry S. Goldstein

¶ 4 (attached as Exhibit A).  These loans relate to approximately 404,600 Connecticut residents.

*Id.*

Education enters into contracts with loan servicers to manage this enormous investment in

access to higher education.[5]  Loan servicers communicate with borrowers, collect payments,

effectuate discharges, and perform other administrative tasks associated with student loans.  For

example, loan servicers play an administrative role in Education's income-driven repayment

---

[3] *See* Federal Student Aid, Federal Student Loan Summary (last viewed December 5, 2019), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (showing $1.481 trillion total outstanding federal student loans at the end of the third quarter of 2019).  The amount for total federal student loans includes both principal and interest on all outstanding Direct Loans, FFELP loans, and Perkins Loans, regardless of whether those loans are managed by the Federal Government.

[4] *See* Federal Student Aid, Portfolio by Loan Status (last viewed December 5, 2019), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (the categories listed under "Federally Managed" total $1.296 trillion at the end of the third quarter of 2019).  This amount for federally managed student loans includes Direct Loans and those FFELP loans that are held by the Federal Government.  The actual value of loans managed by Education is actually somewhat higher than $1.296 trillion, as Education also holds several million dollars in Perkins Loans that are not reflected in this total due to the way Education's data are organized.

[5] Education contracts with nine student loan servicers to service Direct Loans and the FFELP loans that Education holds and manages.  Goldstein Decl. ¶ 5, Ex. A.  Portions of Education's contracts with these nine servicers are available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing.

programs and in the Public Service Loan Forgiveness Program.  *See* 20 U.S.C. § 1087e(e) (income contingent repayment); *id.* § 1087(m) (Public Service Loan Forgiveness Program).

The HEA explicitly authorizes Education to enter into contracts with servicers and sets forth a number of requirements for Education in doing so—for example, Education must "ensure that such services and supplies are provided at competitive prices."  20 U.S.C. § 1087f(a)(1*); see also* 20 U.S.C. § 1018a(c)(1) (Education should "maximize the use of performance-based servicing contracts, consistent with guidelines for such contracts published by the Office of Federal Procurement Policy, to achieve cost savings and improve service"); *see also, e.g.*, PHEAA Contract Attachment A-1 at 3[6] ("It is the intent of the Department to procure a performance-based contract(s) that promotes competition and provides best of business services."), attached as Ex. A to Pl.'s Mot. Summ. J (PHEAA MSJ); PHEAA Contract Attachment A-4 (describing the allocation of loans among servicers based on performance), attached as Ex. A to PHEAA MSJ.  In addition, Education must "enter into contracts only with entities that have extensive and relevant experience and demonstrated effectiveness," must obtain "competitive prices," and select "only entities which the Secretary determines are qualified to provide such services and supplies and will comply with the procedures applicable to the award of such contracts."  20 U.S.C. § 1087f(a).  Pursuant to the Federal Acquisition Regulation, Education must contract only with "responsible" contractors, which means contractors with suitable past performance and financial health, among other requirements.  *See* 48 CFR §§ 9.100 to 9.108-5.

---

[6] The provisions of Education's contract with PHEAA cited throughout this Statement of Interest are available at https://studentaid.ed.gov/sa/about/data-center/business-info/contracts/loan-servicing under "Title IV Additional Servicing (TIVAS) Contracts (2009)."

Beginning with selection and continuing throughout the life of the contracts, Education comprehensively governs its servicers' performance. Even Education's allocation of loans among servicers is driven by the servicers' performance—Education "allocat[es] more loans to servicers that meet performance metrics such as high levels of customer satisfaction and [] pay[s] servicers higher rates for loans that are in a nondelinquent status." Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers (Federal Preemption Notice), 83 Fed. Reg. 10,619, 10,622 (Mar. 12, 2018). Education's continuing supervision of its servicers is reflected in their contracts, which are extensive and lengthy, and frequently updated with modifications in the form of "change requests." One of Education's components, the office of Federal Student Aid (FSA), audits the servicers and communicates daily with them. FSA also "maintains a Feedback System, which includes a formal process for borrowers to report issues or file complaints about their loan experiences, including problems with servicing." *Id.* Borrowers additionally can lodge complaints with "the FSA Ombudsman Group—a neutral and confidential resource available to borrowers to resolve disputes related to their loans." *Id.*

## II. Connecticut Has Also Sought to Regulate Student Loan Servicers by Imposing a Licensing Requirement and Broad Disclosure Requirements.

Despite Education's rigorous existing structures for managing its servicers and Congress' clear direction in the HEA that Education would be responsible for that management, in recent years Connecticut has separately imposed a licensing and regulatory scheme on student loan servicers. *See generally* Conn. Gen. Stat. §§ 36a-846 to 36a-854.

Connecticut requires that all servicers servicing student loans of Connecticut residents obtain a license from Connecticut. *See, e.g.*, Conn. Gen. Stat. § 36a-847 ("No person shall act as

a student loan servicer, directly or indirectly, without first obtaining a license . . . .").[7]  In order to obtain the mandated license, Connecticut imposes numerous requirements.  Student loan servicers must submit an application, including information about the applicant's "personal history and experience" as well as "administrative, civil or criminal findings."  Conn. Gen. Stat. § 36a-847(b)(1).  Applicants must also submit "a financial statement prepared by a certified public accountant."[8]  Conn. Gen. Stat. § 36a-847(b)(1).  Applicants must pay an annual licensing fee of $900, Conn. Gen. Stat. § 36a-847(b)(2), and renew their licenses annually.  The Connecticut Banking Commissioner is empowered to grant or deny licenses to student loan servicers, and is instructed to issue licenses when the commissioner finds that the applicant has sound financial condition, will conduct business "honestly, fairly, equitably, carefully and efficiently within the purposes and intent of [other sections] and in a manner commanding the confidence and trust of the community," employs key employees of "good character," and meets other requirements.  Conn. Gen. Stat. § 36a-847(c).

Connecticut has also imposed broad disclosure requirements on licensed servicers, in order to permit the Connecticut Banking Commissioner to investigate them.  For example, § 36a-849 imposes a two-year record retention requirement on licensees and requires that "each student loan servicer licensee shall make such records available" when requested by the commissioner.  Conn. Gen. Stat. § 36a-849.  Section 36a-851 also grants the Banking Commissioner broad investigatory power "[f]or the purposes of initial licensing, license renewal, license suspension, license revocation or termination" or for investigating compliance with other provisions of Connecticut

---

[7] Banks, credit unions, and their subsidiaries are excepted from the licensing requirement when they act as student loan servicers.  Conn. Gen. Stat. § 36a-847(a)(2).

[8] This requirement "may" be waived for renewal applications when adequate financial information has been captured through annual reports.  Conn. Gen. Stat. § 36a-847(b)(1).

law.  This section includes the power to "control access to any documents and records of the student loan servicer licensee," Conn. Gen. Stat. § 36a-849(b), and to "access, retrieve and use any books, accounts, records, files, documents, information or evidence," as well as "any other documents, information, or evidence the commissioner deems relevant to the inquiry or investigation regardless of the location, possession, control or custody of such documents, information, or evidence," Conn. Gen. Stat. § 36a-849(a)(1).

In addition to these investigative powers set forth in the provisions specifically addressing student loan servicers, the general laws addressing the Banking Commissioner's power to investigate regulated entities also provide investigatory powers, permitting the Commissioner to undertake investigations "concerning any person subject to the jurisdiction of the commissioner." Conn. Gen. Stat. § 36a-17(a)(1).  This same section permits investigations "for the purpose of issuing, renewing, suspending, conditioning, revoking or terminating any license issued on the system, or for any general or specific inquiry or investigation of persons engaged in a business or activity subject to licensure by the commissioner on the system to determine compliance with applicable law."  Conn. Gen. Stat. § 36a-17(d)(1).  These provisions allow the commissioner to "access, receive and use any records, information or evidence" and "any other records, information or evidence the commissioner deems relevant to the inquiry or investigation, regardless of the location, possession, control or custody of such records, information or evidence."  Conn. Gen. Stat. § 36a-17(d)(1).  The section also claims that its authority "shall remain in effect, whether a person acts or claims to act under any licensing, registration or other authorizing requirement of the law of this state, or claims to act without such authority."  Conn. Gen. Stat. § 36a-17(h).

## DISCUSSION

Several sources of federal law demonstrate that Connecticut's demands to PHEAA rest on preempted state law.  The Supremacy Clause of the U.S. Constitution provides that "the Laws of the United States . . . shall be the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Where state law is incompatible with federal law, therefore, state law must yield.  Here, Connecticut's scheme of licensing requirements for servicers of federal student loans is preempted by federal law setting forth the appropriate qualifications for federal contractors.  Indeed, last year a court held that a similar state licensing requirement was preempted as applied to the servicing of federally-owned student loans in the District of Columbia.[9]  *Student Loan Servicing All. v. District of Columbia* (*SLSA*), 351 F. Supp. 3d 26 (D.D.C. 2018).  Furthermore, the broad disclosure requirements that Connecticut applies to student loan servicing as a licensed activity are contrary to the Privacy Act and to Education's contracts with PHEAA and are therefore preempted.

Under conflict preemption, "a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law" either because it is "impossible for a private party to comply with both state and federal requirements" or because "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[10]  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (internal quotation marks and citations omitted); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (an "obstacle" exists whether it "goes by the name of 'conflicting; contrary to; . . . repugnance; difference; irreconcilability;

---

[9] The court in *SLSA* also considered other theories of preemption but found that they did not apply.

[10] "Federal regulations have no less preemptive effect than federal statutes."  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 151, 153 (1982).

inconsistency; violation; curtailment; . . . interference,' or the like"). Conflict preemption does not require that the preempting federal law explicitly provide that state law is preempted.

Federal student loans—as well as the Federal Government's relationships with its servicers and other contractors—implicate uniquely federal interests. *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 504-05 (1988) (holding that federal contracts are an area of uniquely federal interest because "obligations to and rights of the United States under its contracts are governed exclusively by federal law" (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580 (1973); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947); *Nat'l Metro. Bank v. United States*, 323 U.S. 454 (1945))); *cf. United States v. Victory Highway Vill., Inc.*, 662 F.2d 488, 497 (8th Cir. 1981) (holding that because of "an overriding federal interest in protecting the funds of the United States and in securing federal investments," federal law, rather than state or local law, must govern the remedies available upon default of a federally held or insured loan). In an area involving such "uniquely federal interests," the conflict between state and federal law "need not be as sharp as that which must exist for ordinary pre-emption." *Boyle*, 487 U.S. at 504, 507 (citation omitted).

Although Connecticut argues that there is a presumption against preemption where states act for purposes of consumer protection, Mem. Law Supp. State Defs.' Mot. Summ. J. (Conn. MSJ) 14-15, ECF No. 64-2, such a presumption is inapplicable where, as here, a state purports to regulate federal contracts and contractors. *Boyle*, 487 U.S. at 504-05; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (holding that no presumption against federal preemption was warranted because "the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law"). Even if the presumption were applicable, it would be rebutted here. *See Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010) (considering the

presumption, but concluding that the HEA preempted various state-law claims against loan servicers because "it is our duty to consider carefully what Congress was trying to accomplish in the HEA and whether these state law claims create an 'obstacle' to the congressional purposes").

I. **Connecticut's Entire Licensing Scheme Is Preempted by Federal Statutes and Regulations Governing the Selection of Contractors.**

Connecticut's entire licensing scheme for student loan servicers is preempted as applied to the servicing of federally managed student loans.  A federal court analyzing D.C.'s similar state licensing requirements for student loan servicers likewise concluded that those requirements were preempted as to the servicing of federally managed student loans because D.C. sought to second-guess the Federal Government's choice of contractor. *SLSA,* 351 F. Supp. 3d 26.

A. Connecticut's Licensing Scheme Conflicts with Federal Statutes and Regulations Governing Education's Selection of Contractors.

It is well established that states cannot attempt to control the Federal Government's selection of contractors through the imposition of a licensing requirement, and thus Connecticut cannot usurp the Federal Government's authority to select contractors according to its own criteria by imposing a licensing requirement for the servicing of federal student loans.[11]   The Supreme Court and the courts of appeals have frequently invalidated state-licensing requirements for federal employees and federal contractors.  *See Sperry v. Florida ex rel. The Fla. Bar*, 373 U.S. 379, 385 (1963) ("State[s] may not enforce licensing requirements which, though valid in the absence of federal regulation, give 'the State's licensing board a virtual power of review over the federal determination' that a person or agency is qualified and entitled to perform certain functions, or

---

[11] This Statement of Interest addresses only Connecticut's licensing requirement as applied to servicers of federal student loans in the course of their contracts with Education, or, in other words, to the servicing of federally managed student loans.  These loans include Direct Loans, Education-held FFELP loans, and Education-held Perkins Loans.

which impose upon the performance of activity sanctioned by federal license additional conditions

not contemplated by Congress.'" (quoting *Leslie Miller Inc. v. Arkansas*, 352 U.S. 187, 190 (1956)

(footnotes omitted))); *see also United States v. Virginia*, 139 F.3d 984, 987 (4th Cir. 1998) ("[T]he

Virginia regulatory scheme frustrates the objectives of the federal procurement laws by allowing

the state to 'second-guess' the FBI's responsibility determination."); *Gartrell Constr. Inc. v.*

*Aubry*, 940 F.2d 437, 439 (9th Cir. 1991) (holding that a state law is preempted when it "is

effectively attempting to review the Federal Government's responsibility determination" in

selecting its contractor (citation omitted)).

In *Leslie Miller*, the Supreme Court considered whether the State of Arkansas could require

a construction company to obtain an Arkansas contractor's license to perform work for the United

States.   *Leslie Miller Inc.*, 352 U.S. at 187.   The Supreme Court struck down Arkansas's

requirement because:

> [T]he immunity of the instruments of the United States from state control in the
> performance of their duties extends to a requirement that they desist from
> performance until they satisfy a state officer upon examination that they are
> competent for a necessary part of them and pay a fee for permission to go on.  Such
> a requirement does not merely touch the Government servants remotely by a
> general rule of conduct; it lays hold of them in their specific attempt to obey orders
> and requires qualifications in addition to those that the Government has pronounced
> sufficient.  It is the duty of the Department to employ persons competent for their
> work and that duty it must be presumed has been performed.

*Id.* at 190 (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).  Yet here, Connecticut seeks

precisely such a forbidden power of review—that loan servicers "desist from performance until

they satisfy a state officer upon examination that they are competent . . . and pay a fee for

permission to go on" through its licensing requirement and fees.  Connecticut's laws are improper

both because they seek to replicate the federal criteria for evaluating contractors and thereby allow

Connecticut to second-guess the Federal Government's evaluation, and to the extent that they

attempt to add additional criteria beyond what federal law requires.

Here, as in *Leslie Miller*, Connecticut's criteria for licensing student loan servicers overlap with the criteria used by Education to select contractors. Pursuant to the HEA, Education is required to obtain "competitive prices" and to select "only entities which the Secretary determines are qualified to provide such services and supplies and will comply with the procedures applicable to the award of such contracts." 20 U.S.C. § 1087f(a). Congress also intended the servicers to be "selected by and responsible to the Department of Education." H.R. Rep. No. 103-111, at 107 (1993). Pursuant to the Federal Acquisition Regulation, Education must contract only with "responsible" contractors, which means contractors with suitable past performance and financial health. *See* 48 C.F.R. § 9.100 to 9.108-5. Connecticut's licensing requirements duplicate the federal requirement of demonstrating financial responsibility. *Compare* Conn. Gen. Stat. § 36a-847(c) (stating that the Banking Commissioner should issue a license if, *inter alia*, "[t]he applicant's financial condition is sound"), *and* Conn. Gen. Stat. § 36a-847(b)(1) (requiring applicants for a student loan servicing license to submit "a financial statement prepared by a certified public accountant"), *with* 48 C.F.R. § 9.104-1(a) (requiring that prospective contractors "[h]ave adequate financial resources to perform the contract, or the ability to obtain them"). Connecticut's requirements also duplicate the federal requirement of good character and integrity. *Compare* Conn. Gen. Stat. § 36a-847(c)(3) (requiring the Banking Commissioner to grant licenses when, *inter alia*, "[e]each control personal, qualified individual, branch manager and trustee of the applicant is in all respects . . . of good character"), *with* 48 C.F.R. § 9.104-1(d) (requiring that prospective contractors "[h]ave a satisfactory record of integrity and business ethics").

To the extent that Connecticut seeks to impose additional and more stringent requirements on servicers than the federal government has seen fit to impose, *see, e.g.*, Conn. Gen. Stat. § 36a-847(c) (instructing the Connecticut Banking Commissioner to issue licenses when the

commissioner finds that, among other conditions, the applicant has a sound financial condition, will conduct business "honestly, fairly, equitably, carefully and efficiently within the purposes and intent of [other sections] and in a manner commanding the confidence and trust of the community," employs key employees of "good character"), that attempt also impedes the accomplishment and execution of the full purposes and objectives of federal law.  "When Congress has taken the particular subject-matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." *Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co.*, 237 U.S. 597, 604 (1915); *see also United States v. Locke*, 529 U.S. 89, 114 (2000) ("The [federal] statute may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves."); *cf. United States v. California*, No. 2:06-CV-2649-GEB-GGH, 2007 WL 3341670, at *8 (E.D. Cal. Nov. 8, 2007) (holding that conflict preemption barred a state from refusing to disclose criminal history information to federal contractors on the grounds that state law limited such disclosures to only public officials, because the state's public-official requirement was an attempt to "second guess" the agency's determination, as required by federal law, that the contractors were responsible).

The court in *SLSA* followed a similar analysis in concluding that D.C.'s licensing scheme for student loan servicers was preempted by federal law as applied to the servicing of Direct Loans and federally-owned FFELP loans.[12]  *SLSA*, 351 F. Supp. 2d at 61-72, 75-76.  As that court ultimately concluded:

_____

[12] The *SLSA* court concluded that D.C.'s licensing requirements were preempted as to the servicing of Direct Loans and federal-owned FFELP loans, but not as to the servicing of FFELP loans that were not owned by the Federal Government.  *SLSA*, 351 F. Supp. 2d at 65-72.  This is consistent with Education's position here, that preemption applies to the extent Connecticut seeks

> [T]here is a risk that the federal government will contract with a servicer after evaluating its qualifications under federal law and regulations, and that servicer nevertheless will be determined to be unqualified by the Commissioner and barred from operating in the District of Columbia under the D.C. Law and Final Rules. The threat of District of Columbia officials' second-guessing the federal government's contracting decisions is sufficient under *Leslie Miller* to invalidate the state licensing scheme as applied to servicers when servicing their FDLP loans.

*Id.* at 63; *see also id.* at 62 ("It is difficult to see any light between the facts of *Leslie Miller*, where obstacle preemption was found to bar state regulation, and the [Direct Loan] loan servicers here."). For these reasons, Connecticut's attempt to second guess Education's determination of which servicers to contract with "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and is thus preempted by federal law.[13]   *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also* Federal Preemption Notice, 83 Fed. Reg. at 10,620.

B.  <u>Connecticut's Licensing Scheme Is also Barred by the Intergovernmental Immunity Doctrine.</u>

Connecticut's licensing requirements also violate the intergovernmental immunity doctrine.   Under the intergovernmental immunity doctrine, state laws are invalid if they (1) "regulate[] the United States directly" or (2) "discriminate[] against the Federal Government

---

to regulate the servicing of federally managed loans, including Direct Loans, federally-owned FFELP loans, and federally-owned Perkins loans.

[13] Any provisions in the servicers' contracts with Education requiring them to comply with applicable state law requirements are not to the contrary.  *See Gartrell Constr., Inc. v. Aubry*, 940 F.2d 437, 440 (9th Cir. 1991) (rejecting the argument that a state could license federal contractors because the contract required the contractor to obtain all "applicable" licenses because "[f]ollowing *Leslie Miller*, state licensing laws cannot be 'applicable', nor compliance with them 'necessary', where such laws are preempted by federal law"); *see also SLSA*, 351 F. Supp. 2d at 63 (citing *Gartrell* for a similar conclusion).

or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality op.).[14]  Here, Connecticut's licensing scheme does both.

Regulation of federal contractors is one way states can violate the intergovernmental immunity doctrine.  *See id.* at 438 ("[A] regulation imposed on one who deals with the Government has as much potential to obstruct governmental functions as a regulation imposed on the Government itself . . . .").  The Ninth Circuit's decision in *Boeing, Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014), provides an instructive example.  There, California had enacted a site-specific environmental clean-up law covering a parcel of land where the Federal Government, as well as defense contractors, had conducted nuclear research and rocket testing.  *Id.* at 834-35.  Boeing owned most of the site and was also cleaning the site as a federal contractor.  *Id.*  The Ninth Circuit invalidated the California law on intergovernmental immunity grounds, finding that it both directly regulated the contractor's conduct, and discriminated against the Federal Government and those with whom it dealt.

First, the Ninth Circuit held that the California law violated the intergovernmental immunity doctrine by directly regulating Boeing's conduct because the law "mandate[d] the ways in which Boeing renders services that the federal government hired Boeing to perform" and "regulate[d] not only the federal contractor but the effective terms of the federal contract itself." *Id.* at 840.  Here, Connecticut law similarly attempts to directly dictate how the servicers perform their contracts with Education, including by requiring servicers to maintain records, Conn. Gen. Stat. § 36a-849, and mandating that the servicers disclose information that their contracts and

---

[14] Although the controlling opinion in *North Dakota* was a plurality, the Supreme Court was unanimous in concluding that states may not regulate or discriminate against the United States. *North Dakota*, 495 U.S. at 435 (plurality op.); *id.* at 444 (Scalia, J., concurring); *id.* at 451-52 (Brennan, J., dissenting in part).

federal law require them to keep confidential, *see, e.g.*, Conn. Gen. State § 36a-849; Conn. Gen. Stat. § 36a-17(d)(1).   As the Ninth Circuit concluded in *Boeing*, this direct regulation of a federal contractor's duties is improper and is fatal to Connecticut's laws.

In addition to direct regulation, Connecticut's laws also discriminate against the Federal Government and its contractors by placing burdensome regulations, including a licensing requirement and fees, that apply to student loan servicing—an area where the Federal Government is the primary actor—but not to consumer loan servicing in general.

The fact that the Connecticut laws will ostensibly also apply to purely private student loan servicing does not belie the intergovernmental immunity concerns.   In *Boeing*, for example, California's law applied to the entire waste cleanup site, of which the Federal Government owned only portions, yet the Ninth Circuit still determined that the regulation discriminated against the Federal Government or those with whom it dealt because it attempted to apply more stringent cleanup requirements to the parcel than were generally applicable in California.   *Boeing*, 768 F.3d at 842.   Likewise, here, the burden of Connecticut's laws will be felt disproportionately by Education's contractors because federal student loans constitute the vast majority of all extant student loans,[15] and federal contractors service nearly all federal student loans.[16]   *See North*

_____

[15] According to the Federal Reserve, $1.638 trillion was outstanding in all types of student loans (federal and otherwise) at the end of the third quarter in 2019.   Board of Governors of the Federal Reserve, Consumer Credit – G.19 (Dec. 6, 2019), https://www.federalreserve.gov/releases/g19/current/default.htm. At the same time, $1.481 trillion of that was outstanding in federal student loans, or about 90% of the total student loan amount. Federal Student Aid, Federal Student Aid Portfolio Summary (last viewed December 5, 2019), https://studentaid.ed.gov/sa/about/data-center/student/portfolio.

[16] Of the $1.481 trillion outstanding in federal student loans at the end of the third quarter in 2019, $1.296 trillion was managed by the Federal Government.   *See* Federal Student Aid, Portfolio by Loan Status (last viewed December 5, 2019), https://studentaid.ed.gov/sa/about/data-center/student/portfolio (the categories listed under "Federally Managed" total $1.296 trillion at the end of the third quarter of 2019).

*Dakota*, 495 U.S. at 435 ("[T]he question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation. Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory 'with regard to the economic burdens that result.'" (quoting *Washington v. United States*, 460 U.S. 536, 544 (1983))).[17]

## II.   The Disclosure Requirements in Connecticut Law that Underlie Connecticut's Demands for Records Are Preempted Because They Conflict with the Privacy Act and the Servicers' Contracts with Education.

As previously discussed, Connecticut's entire scheme requiring licensing for student loan servicing is preempted as applied to the servicing of federally managed student loans.  This conclusion also means that Connecticut's disclosure provisions for licensed entities are of no effect, as those are part of Connecticut's licensing scheme.  Connecticut resists the most natural reading of Connecticut's laws—that the disclosure provisions apply to those entities subject to the licensing requirements[18]—instead arguing that the disclosure requirements apply to student loan

---

[17] The court in *SLSA* did not adopt an intergovernmental immunity rationale, but considered it only as applied to the regulation of servicing of non-federally owned FFELP loans, *SLSA*, 351 F. Supp. 2d at 72-75, an argument not advanced here.

[18] Most of the disclosure requirements specify in their text that they apply only to licensed student loan servicers:

- "Each student loan servicer *licensee* shall maintain adequate records . . . ."  Conn. Gen. Stat. § 36a-849(a) (emphasis added).
- "[E]ach student loan servicer *licensee* shall make such records available . . ."  Conn. Gen. Stat. § 36a-849(b) (emphasis added).
- Granting investigative authority "[f]or the purposes of initial *licensing*, *license* renewal, *license* suspension, *license* revocation or termination, or general or specific inquiry or investigation to determine compliance with sections 36a-846 to 36a-854 [*licensing* provisions for student loan servicers], inclusive . . . ."  Conn. Gen. Stat. § 36a-851(a)(1) (emphasis added).
- Granting the power to "investigate or examine any student loan servicer *licensee* or person subject to said sections [the *licensing* provisions] . . . ."  Conn. Gen. Stat. § 36a-851(a)(2) (emphasis added)

The remaining two disclosure requirements cover entities in a regulated area:

servicers independent of their status as licensed entities.  Conn. MSJ. at 24-25.  Connecticut's first argument is that the disclosure provisions by their terms apply both to servicers acting with licenses, and servicers defying Connecticut law to act without licenses, but authority over such "renegade" servicers would still stem from Connecticut's licensing requirements (in other words, if Connecticut's legislature repealed the licensing requirements for all student loan servicers, the disclosure requirements would no longer apply to any student loan servicers).  Connecticut further argues that "any person" can be compelled to produce a record under Connecticut General Statutes § 36a-17(a)(2), Conn. MSJ at 25, but that topics of that production are limited to those "concerning the matter to be investigated or about which an action or proceeding is pending," Conn. Gen. Stat. § 36a-17(a)(2), which presumably would still be limited to the licensed activities subject to the jurisdiction of the Banking Commissioner.  In any event, even if Connecticut was correct, the disclosure requirements would *also* be preempted for separate reasons, as described below.

A.  Connecticut's Disclosure Provisions Would Require Servicers to Violate the Privacy Act.

In addition to the preemption of Connecticut's entire licensing scheme, federal law— including the Privacy Act and the servicers' contracts with Education—also preempts the specific provisions of Connecticut's law that purport to require servicers to disclose certain records.  The Privacy Act governs records "about an individual . . . maintained by an agency . . . and that contain[] [the individual's] name, or the identifying number, symbol, or other identifying particular

---

- Allowing investigations "concerning any person *subject to the jurisdiction* of the commissioner . . . ."  Conn. Gen. Stat. § 36a-17(a)(1).
- Permitting investigations "for the purpose of issuing, renewing, suspending, conditioning, revoking or terminating any *license* issued on the system, or for any general or specific inquiry or investigation of persons engaged in a business or activity *subject to licensure* by the commissioner on the system to determine compliance with applicable law."  Conn. Gen. Stat. § 36a-17(d)(1) (emphasis added).

assigned to the individual," *id.* § 552a(a)(4), that are stored in a "system of records," or "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual," *id.* § 552a(a)(5).  The Privacy Act provides that "[n]o agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior consent of, the individual to whom the record pertains"—unless an exception applies.  5 U.S.C. § 552a(b).  Education possesses Privacy Act-covered information, including relating to student-borrowers, such as records containing borrowers' names, contact information, identification numbers, and other personally-identifiable information.  Accordingly, Education has promulgated a number of System of Records Notices (SORNs) that describe the personally identifiable information that it collects and maintains and describes how Education may use and disclose the information contained in those records.  *See generally* Privacy Act System of Record Notice Issuances (SORN) (last visited Dec. 19, 2019), https://www2.ed.gov/notices/ed-pia.html.

Such records are also necessary to the work that servicers perform for Education in administering federally managed student loans.  The Privacy Act covers such records whether they are in Education's custody or in the custody of Education's contractors.  *See* 5 U.S.C. § 552a(m)(1) ("When an agency provides by a contract for the operation by or on behalf of the agency of a system of records to accomplish an agency function, the agency shall, consistent with its authority, cause the requirements of this section to be applied to such system.").  Both Education and the contractors are bound to comply with the Privacy Act in various ways.[19]  It is not optional for

---

[19] Agencies can be subject to civil liability if they violate the Privacy Act, 5 U.S.C. § 552a(g), and their officers and employees can be subject to criminal liability, 5 U.S.C. § 552a(i). Contractors, such as student loan servicers, can be subject to criminal liability if they violate the Privacy Act.  *See id.* § 552a(m)(1) (providing that contractors are considered employees for the

agencies to ensure that their contractors comply with the Privacy Act—or for Education here to instruct PHEAA to comply with the Privacy Act—because agencies may be liable for Privacy Act violations committed by their contractors. *See Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 125 n.3 (2d Cir. 2008) (discussing the possibility of criminal liability for a contractor, and civil liability for the contracting agency, based on the contractor's violation of the Privacy Act). Accordingly, Education has taken pains to ensure through its contracts with the servicers that servicers comply with the Privacy Act. *See, e.g.*, PHEAA Contract, Addendum 2 at B.2 (incorporating by reference two Federal Acquisition Regulation clauses pertaining to the Privacy Act: 52.224-1 and 52.224-2), attached as Ex. A to PHEAA MSJ; 48 C.F.R. § 52.224-1 (Privacy Act Notification clause requiring contractors to "design, develop, or operate a system of records on individuals" and warning that that system will be "subject to the Privacy Act" and that "[v]iolation of the Act may involve the imposition of criminal penalties"); 48 C.F.R. § 52.224-2 (Privacy Act clause requiring contractors to comply with the Privacy Act).

Connecticut's broad disclosure requirements applicable to licensed student loan servicers conflict with the Privacy Act. Connecticut law seeks to provide a virtually unlimited right of access by the Banking Commissioner to records possessed by licensed student loan servicers. *See, e.g.*, Conn. Gen. Stat. § 36a-851(b) (giving the Banking Commissioner the power to "control access to any documents and records of the student loan servicer licensee").[20] Other provisions

---

purposes of § 552a(i)); *id.* § 552a(i) (providing for criminal penalties for disclosures by employees).

[20] The Banking Commission can also "access, retrieve and use any books, accounts, records, files, documents, information or evidence," as well as "any other documents, information, or evidence the commissioner deems relevant to the inquiry or investigation regardless of the location, possession, control or custody of such documents, information, or evidence." Conn. Gen. Stat. § 36a-851(a)(1).

apply to licensed student loan servicers in common with other entities regulated by the Connecticut Department of Banking, allowing the commissioner to "access, receive and use any records, information or evidence" and "any other records, information or evidence the commissioner deems relevant to the inquiry or investigation, regardless of the location, possession, control or custody of such records, information or evidence," Conn. Gen. Stat. § 36a-17(d)(1), "concerning any person subject to the jurisdiction of the commissioner," Conn. Gen. Stat. § 36a-17(a)(1). These provisions apply to the *same* information covered by the Privacy Act, but purport to establish a *different* threshold for release, thus demonstrating the conflict. Connecticut's laws make absolutely no allowance for servicers' need to comply with the Privacy Act, and indeed, Connecticut's course of action here has likewise demonstrated that it is insensate to the need for PHEAA and Education to comply with the Privacy Act. *See* Conn. MSJ at 5-6 (describing Connecticut's position that PHEAA must provide "unrestricted" access to records). These broad disclosure requirements are therefore preempted by the Privacy Act.

Furthermore, although both Education and its contractors may have custody of Privacy Act-covered records, the Privacy Act contemplates that requests for access to such covered records will be made to Education, not Education's contractors. Memorandum from Patrick A. Bradfield, Director, Federal Student Aid Acquisitions 1 (Dec. 27, 2017), ECF No. 65-6 ("All records maintained in any Department systems of records to which the Department provides its contractors access remain at all times records of the Department, not records of a contractor. Any request from any third party for Department records to which a contractor has access must be made directly to the Department, where it will be  evaluated for compliance with the requirements of the Privacy Act, unless the contract has specifically provided otherwise."); PHEAA Contract, Attachment A-2 ¶ 80(d) (prohibiting servicers from "disseminati[ng] copies of any deliverable that contains

- 21 -

information covered by the Privacy Act"), attached as Ex. A to PHEAA MSJ. Indeed, it is Education's SORNs that explain the means of requesting Privacy Act covered information. Connecticut thus further errs by arguing that PHEAA should be the gatekeeper for Education's records, rather than Education itself.

Connecticut does not dispute that the records it seeks are covered by the Privacy Act. Instead, Connecticut cites three cases that it purports establish that the Privacy Act cannot prohibit a contractor from complying with a records request.  Conn. MSJ at 28.  But each of these cases deals with documents sought through *discovery* in federal court, as governed by Rule 34 and the other Federal Rules of Civil Procedure.  Thus, they deal with how to interpret and harmonize multiple sources of *federal* law—for example, a federal agency's regulations and Federal Rule of Civil Procedure 34.  None discusses preemption at all, because none deals with a potential conflict between state and federal law.  *See In re Bankers Tr. Co.*, 61 F.3d 465 (6th Cir. 1995) (addressing tension between a federal agency's regulations and Federal Rule of Civil Procedure 34); *Bank of Am., N.A. v. BDO Seidman, LLP*, No. 061705BLS1, 2007 WL 4357801 (Mass. Super. Nov. 26, 2007) (same); *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-CV-101, 2018 WL 3824367 (M.D. Pa. Aug. 10, 2018) (resolving tension between the Privacy Act and the Federal Rules of Civil Procedure).  In *Navient*, the only case dealing with the Privacy Act at all, the court even issued a court order to place discovery disclosures within the Privacy Act exception for disclosures in accordance with a court order.  *Navient Corp.*, 3:17-CV-101, 2018 WL 3824367, at *2 n.6 (M.D. Pa. Aug. 10, 2018).  And, in each case the disclosures were either already occurring under a protective order, *id.* at *2; *Bank of Am.* at *2, or the court ordered further consideration of a protective order, *Bankers Trust*, 61 F.3d at 472, thus providing additional safeguards for disclosed information not present through Connecticut's disclosure requirements.

Connecticut does not identify a single case holding that a state may pass a state law circumventing the requirements of the Privacy Act.  A close look at *SLSA v. Taylor* further clarifies the Privacy Act problem with Connecticut's laws.  The court in *SLSA* considered whether D.C.'s regulations on student loan servicers were preempted by the Privacy Act, but concluded that they were not because D.C.'s regulations contained explicit carve-outs for the requirements of federal law.  *See SLSA*, 351 F. Supp. 2d at 60 ("The D.C. Final Rules themselves specify that student loan servicers shall retain records '[e]xcept to the extent prohibited by federal law.' . . . In addition, the Commissioner retains the discretion to 'waive or reduce [record keeping] requirements if [she] determines that compliance would require the licensee to violate federal law.'").  In contrast, Connecticut's laws contain no such carve-outs to ensure that they do not require servicers to violate federal law.  Indeed, during the *SLSA* litigation D.C. clearly understood that it should direct requests for Privacy Act covered information to Education, not to its contractors.  *See SLSA*, 351 F. Supp. 2d at 60 (noting that "[t]o comply with federal law, the District explains that if it wished to obtain information that might be covered under the Privacy Act, it would 'request borrower consent,' 34 C.F.R. § 5b.9(a), or submit a written request to [Education], 34 C.F.R. § 5b.9(b)(7).").  Here, again, the situation is markedly different—although Connecticut did at one point submit a Privacy Act request to Education, when the result displeased Connecticut, Connecticut launched a collateral attack by attempting to compel Education's contractors to violate the Privacy Act in order to be able to continue fulfilling their contractual obligations in Connecticut.  Federal Law therefore preempts Connecticut's disclosure requirements to the extent that they would compel servicers to disclose information in violation of the Privacy Act.

B.  <u>Connecticut's Disclosure Provisions Would Require Servicers to Violate Their</u>
<u>Contracts with Education.</u>

In addition to conflict preemption stemming from the Privacy Act itself, Connecticut's

disclosure requirements are also preempted by the servicers' contracts with Education.  Conflict

preemption may arise from conflicts between state law and the provisions of contracts between the

Federal Government and contractors.  *See Boyle v. United Techs. Corp.*, 487 U.S. 500 (1988); *e.g.*,

*id.* at 509 (identifying a conflict because "the state-imposed duty of care that is the asserted basis

of the contractor's liability . . . is precisely contrary to the duty imposed by the Government

contract").  In *Boyle*, the Supreme Court recognized that such preemption could occur in (1) areas

of "uniquely federal interests" with (2) "'significant conflict' . . . between an identifiable 'federal

policy or interest and the [operation] of state law,' or [where] the application of state law would

'frustrate specific objectives' of federal legislation."  *Id.* at 507 (citations omitted).

Both requirements for preemption by contract are met here.  Federal student loans are an

area of uniquely federal interests.  *See id.* at 504-05 (finding that federal contracts are an area of

uniquely federal interest because "obligations to and rights of the United States under its contracts

are governed exclusively by federal law" (citing *United States v. Little Lake Misere Land Co.*, 412

U.S. 580 (1973); *Priebe & Sons, Inc. v. United States*, 332 U.S. 407 (1947); *Nat'l Metro. Bank v.*

*United States*, 323 U.S. 454 (1945))).  The operation of Connecticut law would frustrate specific

objectives of federal legislation—namely, Education's interest in managing its servicers and

controlling the release of its information.

The Rules are in conflict with Education's contracts because the Rules treat the servicer as

the party in control of the data, records and other information and would require the servicer to

violate the contract that gives that control to Education.  *See, e.g.*, PHEAA Contract, Attachment

A-2 ¶ 80(b) ("Contractor shall treat all deliverables under the contract as the property of the U.S.

- 24 -

Government for which the Government Agency shall have unlimited rights to use, dispose of, or disclose such data contained therein as it determines to be in the public interest."); PHEAA Contract, Attachment A-2 ¶ 80(f) ("The Government Agency owns the rights to all data/records produced as part of this contract."); PHEAA Contract, Attachment A-2 ¶ 80(d) (prohibiting servicers from "disseminati[ng] copies of any deliverable that contains information covered by the Privacy Act").  Any disclosures of data produced as part of the servicers' performance of their contracts—even if the disclosed data were not covered by the Privacy Act—would therefore violate the servicers' contracts with Education.  Connecticut's disclosure requirements are therefore preempted to the extent that they conflict with the data provisions in the Department's contracts with its servicers.

C.  The Events of this Case Typify the Conflict Between Connecticut Law and Federal Law.

Connecticut's demands here that that PHEAA provide "unrestricted," Conn. MSJ at 5, access to its records are just one example of the potential for conflict between Connecticut's laws and federal law, and exemplify the risk that Connecticut will seek to compel servicers to reveal potentially unlimited types and amounts of sensitive information to the Banking Commissioner. When Connecticut's direct request to Education for access to records was denied, Connecticut attempted to sidestep the systems for access to records set up by federal law and compel PHEAA to violate the Privacy Act—and its contract—instead.

And although Connecticut extensively discusses Education's resolution of Connecticut's separate request to Education, and insinuates that Education's decision was wrong, that decision is not at issue in this case.  Connecticut has not brought suit against Education, and Education is only a defendant in this case to bind Education to the judgment.  This lawsuit by PHEAA seeks a general legal determination as to whether Connecticut's laws are preempted by Federal law, not

an exploration of the fact-specific contexts in which federal law permits disclosure of such records. This case is not the forum for any dispute Connecticut may have with Education's resolution of its request.[21]  Indeed, if Connecticut actually wanted to pursue access to records owned by Education from Education, its options might include a FOIA request to Education, followed by litigation against Education if it was unsatisfied with the result.  That Connecticut has instead chosen to try and obtain Education's records through the "backdoor" means of a request to Education's contractor further demonstrates that the unlimited power of disclosure that Connecticut claims is incompatible with federal law.

Connecticut also complains that Education wrongfully "refused to authorize PHEAA to disclose <u>any</u> data" and suggests that Education should have released redacted data. Conn. MSJ at 29. This argument, which is also irrelevant insofar as it relates to Education's handling of its request, is a red herring.  Connecticut does not establish that it ever clearly requested redacted data

---

[21]  Although irrelevant here, Connecticut is also incorrect to suggest that Education wrongfully denied its request.  *Contra* Conn. MSJ at 30 ("Hence, ED's refusal to allow PHEAA to comply with Connecticut law was both inexplicable and illegal.").  The Privacy Act does not compel Education to accede to *any* request for information by a state regulator.  Contra Conn. MSJ at 8 ("ED contractors include federal loan servicers, with disclosure authorized to permit state and local entities to verify a contractor's compliance with debt collection, financial, and other applicable statutory, regulatory, or local requirements.").  The relevant SORNs that control Education's disclosure of borrower data held by servicers to state regulators provide that Education "may" disclose such basis "on a case-by-case basis."  Notice of an Altered System of Records entitled "Common Services for Borrowers (CSB)" (18-11-16), 81 Fed. Reg. 60,683, 60,686 (Sept. 2, 2016).  Furthermore, such disclosures are permitted "in order to permit these governmental entities to verify the contractor's compliance with . . . applicable statutory, regulatory, or local requirements," *id.* at 60,687, and, for the reasons previously discussed, Connecticut's regulatory scheme for student loan servicers is not "applicable" and obtaining records for the purpose of verifying compliance with it is thus not an authorized use.  *See also generally* 5 U.S.C. § 552a(b)(7) (permitting disclosures to governmental entities for "civil or criminal law enforcement activity" under certain conditions); Notice of a Modified System of Records entitled "Customer Engagement Management System (CEMS)" (18-11-11), 83 Fed. Reg. 27,587 (June 13, 2018) (addressing discretionary releases for enforcement purposes).

from Education or PHEAA, and indeed that idea is in some tension with Connecticut's characterization of its own request as for "unrestricted" information. Conn. MSJ at 5. In any event, Connecticut's extremely broad and sweeping disclosure requirements cannot be permitted to conflict with the Privacy Act in the hopes that Connecticut will always, as a matter of administrative grace, choose to pursue only redacted information.

## CONCLUSION

For the above reasons, Connecticut's laws requiring servicers of federal student loans to obtain a license from Connecticut and, as a condition of that license, make unlimited disclosures of records to Connecticut are preempted by federal law, including the Privacy Act and the Federal Government's ability to select contractors.

Dated: December 20, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

/s/ Rebecca M. Kopplin
REBECCA M. KOPPLIN
Trial Attorney (California Bar No. 313970)
MICHAEL DREZNER
Trial Attorney (Virginia Bar No. 83836)
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, D.C. 20005
Telephone: (202) 514-3953
Facsimile: (202) 616-8470
Email: Rebecca.M.Kopplin@usdoj.gov

*Counsel for Federal Defendants*