UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| PENNSYLVANIA HIGHER EDUCATION ASSISTANCE AGENCY, Plaintiff, v. JORGE L. PEREZ *in his official capacity as Commissioner of the Connecticut Department of Banking*, the CONNECTICUT DEPARTMENT OF BANKING, BETSY DEVOS *in her official capacity as Secretary of the United States Department of Education*, and the UNITED STATES DEPARTMENT OF EDUCATION, Defendants. | No. 3:18-cv-1114 (MPS) |

RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Pennsylvania Higher Education Assistance Agency ("PHEAA") services student loans of borrowers in Connecticut and other States. In 2018, it filed this lawsuit because it faced conflicting demands from two sovereigns about the records it had created or maintained concerning its Connecticut federal student loan borrowers. The Connecticut Department of Banking ("CT DOB") was seeking the records as part of an "examination" of PHEAA's loan servicing activities in Connecticut, while the United States Department of Education ("Education"), which had hired PHEAA to service federal student loans, was instructing PHEAA that disclosing the records to the CT DOB would violate both its contract with Education and the

1

Privacy Act, 5 U.S.C. § 552a. PHEAA sought a declaratory judgment as to whether the CT

DOB's demands for the records are, as Education contends, preempted by federal law.

After reviewing the cross-motions for summary judgment filed by PHEAA and

Defendants CT DOB and its Commissioner (the "State Defendants"), as well as Defendant

Education's "Statement of Interest," and after hearing oral argument, I conclude that the CT

DOB's document demands are indeed preempted and grant summary judgment in favor of

PHEAA. Those demands relied on the authority of a Connecticut statute that required PHEAA to

obtain a license to service student loans in Connecticut and allowed the Commissioner to

conduct examinations of licensees. That statute conflicts with Congress' delegation of authority

to Education in the Higher Education Act, 20 U.S.C. §§ 1087a *et seq.* (the "HEA"), to vet and

select its student loan servicer contractors, because it effectively allows the State to second-guess

Education's selection of the servicers of federal student loans in Connecticut. The Supreme

Court has repeatedly struck down States' attempts to apply licensing statutes to federal

contractors, even when those statutes otherwise fall within traditional areas of State authority,

such as consumer protection. And although the State Defendants also point to the CT DOB

Commissioner's general authority to conduct investigations of persons under his jurisdiction to

support their document demands, they fail to cite any law or regulation, apart from the invalid

licensing statute, that brought PHEAA under the Commissioner's jurisdiction when the demands

were made. In any event, even if the Commissioner had some residual authority over PHEAA

when the document demands were made, they would still be preempted, because PHEAA cannot

possibly comply with them while at the same time complying with Education's interpretation of

the federal Privacy Act, by which PHEAA is bound.

2

Finally, and contrary to my earlier ruling on a motion to dismiss in this case, I conclude that Education and Secretary Betsy Devos (the "Federal Defendants") have sovereign immunity and dismiss them from this action.

## I.     BACKGROUND

I begin with a discussion of the statutory framework and the factual background. The facts are drawn from the parties' Local Rule 56(a) statements and are undisputed unless otherwise indicated.

### A.   <u>Federal Student Loans & Servicers</u>

The records sought by the State Defendants in this case related to the Public Service Loan Forgiveness ("PLSF") Program. ECF No. 65-4 ¶ 12; ECF No. 67-1 ¶ 12. Under the PSLF, student borrowers who work for a qualified public service employer and make 120 payments on their debt may seek loan forgiveness. *See* 34 C.F.R. 685.219. The PSLF is a feature of the HEA's William D. Ford Direct Loan Program, under which Education makes loans directly to student borrowers, who repay the loans directly to Education ("Direct Loans"). *Id.*; ECF No. 68-1 ¶ 1.

Education does not service Direct Loans itself; rather, Education contracts with third-party servicers to perform this function. ECF No. 68-1 ¶¶ 3–4. Specifically, the HEA authorizes the Secretary of Education to enter into contracts with third parties for the servicing and collection of Direct Loans. 20 U.S.C. § 1087f(b)(1). Those third parties include "only entities which the Secretary determines are qualified to provide such services and will comply with the procedures applicable to the award of such contracts." *Id.* § 1087f(a)(2). In addition, such "entities" must "have extensive and relevant experience and demonstrated effectiveness." *Id.* Further, the Secretary must "ensure that such services . . . are provided at competitive prices." *Id.* § 1087(a)(1). The bidding process for Education's selection of student loan servicers is also

governed by the Federal Acquisition Regulations, which require Education to contract only with "responsible" contractors, *i.e.*, contractors that "(a) [h]ave adequate financial resources to perform the contract, or the ability to obtain them," "(b) [are] able to comply with the required or proposed delivery or performance schedule," "(c) [h]ave a satisfactory performance record," "(d) [h]ave a satisfactory record of integrity and business ethics," (e) "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them," and meet other requirements. 48 C.F.R. §§ 9.103-9.104.

### B.  PHEAA's Contract with Education & The Privacy Act

In 2009, Education chose PHEAA to be one of the "entities" servicing Direct Loans and entered into a contract with it. ECF No. 68-1 ¶ 5. The contract requires PHEAA to "maintain a full understanding of all federal and state laws and regulations" and to "ensur[e] that all aspects of the service continue to remain in compliance as changes occur." ECF No. 68-1 ¶ 6. The contract also requires PHEAA to comply with federal records management requirements, including safeguarding records covered by the Privacy Act. *Id.* ¶ 7; ECF No. 65-8 at 53. As to the records, the contract states:

> It is understood and mutually agreed that the Department of Education has exclusive ownership of all information stored in, retrieved, modified, and/or archived in as part of this service. The contractor shall have no rights in such information and no rights to such information shall vest on the contractor by virtue of its performance of this contract. No other party has the right to copy, delete, archive, or transfer such information without the prior express written consent of the Department of Education.

ECF No. 65-8 at 24; *see also id.* at 53–54 (requiring Privacy Act compliance and providing that PHEAA "shall treat all deliverables under the contract as the property of the U.S. Government for which [Education] shall have unlimited rights to use, dispose of, or disclose such data contained therein as it determines to be in the public interest" and "[PHEAA] shall not retain,

use, sell, or disseminate copies of any deliverable that contains information covered by the Privacy Act . . . .").

The Privacy Act protects from disclosure data collected by the Government regarding individuals. Specifically, it prohibits agencies of the federal government from disclosing records—including federal student loan records—containing information about an individual without the individual's consent. 5 U.S.C. § 552a(b). Among other things, the Act imposes criminal penalties on government employees, government contractors, and employees of government contractors for violations of its provisions. *Id.* § 552a(i),(m).

The Act's prohibition is, however, subject to exceptions, one of which, the "routine use" exception, is pertinent to this case. The Act defines a "routine use" as "the use of [a] record for a purpose which is compatible with the purpose for which it was collected." 5 U.S.C. § 552a(a)(7); *see also id.* § 552(b)(3). Application of this definition obviously requires an understanding of the "purpose" for which the information was requested, and the statute leaves elaboration of "routine uses" to each federal agency. Specifically, each agency that maintains a "system of records"—a system from which information is retrieved by an individual's name or similar identifying information, *id.* § 552a(a)(5)—must publish in the Federal Register a notice regarding its system of records (known as a "system of records notice" or "SORN"), including a specification of "each routine use of the records contained in the system, including the categories of users and purpose of such use." *Id.* § 552a(e)(4). On September 2, 2016, Education published a SORN listing routine uses it recognized, including that it "may disclose records . . . [t]o allow [it] to make disclosures to governmental entities at the Federal, State, local, or tribal levels regarding the practices of [Education] contractors who have been provided with access to the CSB [Common Services for Borrowers] system (e.g., Federal Loan servicers . . . ) . . . in order to

permit these governmental entities to verify the contractor's compliance with debt collection, financial, and other applicable statutory, regulatory, or local requirements." Privacy Act of 1974; System of Records, 81 Fed. Reg. 60687 (Sept. 2, 2016).

### C.  Connecticut's Regulation of Student Loan Servicers

In 2015, Connecticut adopted legislation requiring student loan servicers operating in Connecticut to obtain a license. *See* 2015 Conn. Acts 15-162 (effective July 1, 2016), codified at Conn. Gen. Stat. §§ 36a-846 to 854. The act, "aimed at curbing unfair, deceptive, and abusive student loan debt collection practices" and codified in Title 36a as part of Connecticut's Banking Law, authorized the Commissioner of the CT DOB to regulate student loan servicers. ECF No. 68-1 ¶ 8. As codified, the statute provides that "[n]o person shall act as a student loan servicer, directly or indirectly, without first obtaining a license . . . from the commissioner [of the CT DOB]." Conn. Gen. Stat. § 36a-847. The statute also prohibits student loan servicer licensees from defrauding or misleading student borrowers, engaging in unfair or deceptive practices, misapplying loan payments, or providing inaccurate information to credit bureaus. *Id.* § 36a-850. It further authorizes the Commissioner "to conduct investigations and examinations" related to licensing and—"[f]or the purposes of investigating violations or complaints arising under sections 36a-846 to 36a-854"—to "review, investigate or examine any student loan servicer licensee or person subject to said sections." *Id.* § 36a-851(a)(1)–(2).

### D.  CT DOB's Examination of PHEAA

On May 1, 2017, PHEAA applied for a license from the CT DOB to operate as a student loan servicer in Connecticut in accordance with Conn. Gen. Stat. § 36a-847(b). ECF No. 68-1 ¶ 15. CT DOB approved PHEAA's application on June 30, 2017. *Id.* ¶ 16. On November 3, 2017, CT DOB notified PHEAA via email that it would be conducting a "limited scope examination and

requested records pertaining to [PHEAA's] servicing of student loans by way of questionnaire." *Id.* ¶ 17. Among other things, CT DOB's questionnaire, entitled "Student Loan Servicer Management Questionnaire and Information Request," sought information regarding PHEAA and the PLSF program, including: (a) a "management chart showing the [licensed] entity's divisions and managers" and whether it was currently under investigation by any governmental authority; (b) a list of complaints, including "all Connecticut complaints" with identifying information of each complainant; (c) the number of student loan borrowers in the PSLF program and their respective loan balances; (d) the number of borrowers that were in forbearance at the time they were placed in PSLF with $0 payments; (e) the number of new PLSF applications approved and denied for each of these groups; (f) the number of PLSF applications deemed incomplete for each of these groups; and (g) the number of recertification applications received, approved, and denied. *Id.* ¶ 20; ECF No. 64-7 at 6-9. CT DOB later clarified its request for borrower complaints to include those "either filed directly with [PHEAA], through the U.S. Dept. of Education, CFPB or any other entity starting 1/17 through October 31, 2017 regarding PSLF transfers." ECF No. 68-1 ¶ 22.

On December 18, 2017, CT DOB notified PHEAA that Education had failed to respond and told PHEAA that it would "no longer initiate communications to [Education] on your behalf."

Education emailed PHEAA on November 7, 2017 stating that PHEAA should inform CT DOB to contact Education directly and that PHEAA should "not release any information on [Education] held loans." ECF No. 65-9 at 2. On November 9, PHEAA notified CT DOB that Education had instructed it not to release "any data or documentation related to PSLF." ECF No. 68-1 ¶ 23. PHEAA referred CT DOB to Education for "any concerns or comments." *Id.* CT DOB "repeatedly attempted to contact [Education] via email and voicemail," but received no response. *Id.* ¶ 24.

On December 18, 2017, CT DOB notified PHEAA that Education had failed to respond and told PHEAA that it would "no longer initiate communications to [Education] on your behalf."

*Id.* ¶ 25. CT DOB also reminded PHEAA that "[a]s a licensee with the Department [of Banking], PHEAA must adhere to Connecticut's statutory requirements governing student loan servicers . . . . includ[ing], but not limited to, providing unrestricted access to records in connection with an examination or investigation pursuant to Sections 36a-17 and 36a-851 of the Connecticut General Statutes." ECF No. 64-9 at 3 (December 18, 2017 email from CT DOB to PHEAA). CT DOB reiterated its request for records, citing Conn. Gen. Stat. §§ 36a-17 and 36a-851, and warned that failure to provide the information by January 5, 2018 "may result in administrative action against PHEAA, including but not limited to suspension of your student loan servicer license in Connecticut." *Id.* In response, PHEAA offered to help coordinate communication between CT DOB and Education. ECF No. 68-1 ¶ 26.

On December 27, 2017, Education issued a memorandum to PHEAA entitled "Ownership and Access to U.S. Department of Education Records and Data." *Id.* ¶ 27. Education explained that it maintained federal student loan records in a System of Records protected by the Privacy Act, that Education owned these records, and that "any request from any third party for [Education] records to which a contractor has access must be made directly to [Education], where it will be evaluated for compliance with the requirements of the Privacy Act, unless the contract has specifically provided otherwise." *Id.*

On January 11, 2018, PHEAA submitted information responsive to part of CT DOB's questionnaire. *Id.* ¶ 29. But PHEAA withheld "responsive documents [or] data that are specific to [Federal Student Aid]," including documents and data concerning borrower complaints and payments. *Id.* ¶¶ 29–30.

Also on January 11, CT DOB participated in a call with Education and requested access to the withheld records. *Id.* ¶ 31. Education recommended that CT DOB send a written request

directly to Education and indicated that it would be "reviewed promptly." *Id.* CT DOB did so on January 12, requesting access to "all records maintained by PHEAA in its servicing of student loans." *Id.* ¶ 32. CT DOB noted in the letter that it was requesting the documents "to verify PHEAA's compliance with applicable statutory and regulatory requirements" and that any information obtained "is considered confidential and protected from disclosure pursuant to Section 36a-21 of the Connecticut General Statutes." *Id.* ¶ 33. Education refused to authorize access—though it had granted access in the past—and asked CT DOB to identify how its request for access comports with the purposes enumerated in its September 2, 2016 SORN. *Id.* ¶ 35. On January 24, 2018, CT DOB emailed Education explaining that "access [to the records] was necessary for the examination of PHEAA" and CT DOB's "examination of PHEAA is integral to PHEAA's continued ability to service [federal] loans in Connecticut and [is] part of the process [employed by the CT DOB] to investigate consumer complaints and ensure that PHEAA complies with applicable requirements and regulations." *Id.* ¶ 36; ECF No. 64-12 at 2.

Education formally denied CT DOB's January 12 request for records on March 26, 2018. ECF No. 68-1 ¶ 44. In its denial letter, Education stated that the records belonged to Education and not to PHEAA, that the records were protected by the Privacy Act, and that CT DOB's request was not a "routine use." ECF No. 64-15 at 2. Specifically, Education wrote that "Sections 36a-847 to 36a-854 of the Connecticut General Statutes are [not] 'applicable statutory . . . requirements' allowing disclosure under this routine use [as described in the September 2, 2016 SORN]" because those "[s]tate laws regulating Direct Loan servicing are preempted by Federal law." *Id.* Education told CT DOB it could "submit a new request if you believe any other exception to the Privacy Act's requirements apply or another request relying on any routine use you believe is applicable

with specification as to how the disclosure is compatible with the purpose(s) for which the information in the record was collected." *Id.* at 3.

On March 21, 2018, CT DOB wrote to PHEAA to "formally convey [CT DOB's] concerns related to [its] examination [of PHEAA] and provide PHEAA with an opportunity to show compliance with all lawful requirements for the retention of its student loan servicer license in Connecticut." ECF No. 64-14 at 2. It reminded PHEAA that "[s]everal Connecticut statutory provisions require student loan servicer licensees to produce records when requested to do so by the Commissioner in connection with an examination." *Id.* at 2–3 (citing Conn. Gen. Stat. §§ 36a-17, 36a-849, and 36a-851). The letter demanded that PHEAA respond by April 4, 2018 and warned that, "[i]f no written response is received by that date or if the [CT DOB] finds any such response to be insufficient, the [CT DOB] may issue an administrative action against your license." *Id.* at 5. The letter also warned that failure to produce documents "forms a basis to take other administrative action as the [CT DOB] deems appropriate, including, but not limited to, initiation of proceedings to order PHEAA to cease and desist and impose a civil penalty on PHEAA of up to $100,000 per violation." *Id.* at 4.

On April 2, 2018, Education sent a letter to PHEAA, copying the CT DOB, regarding the CT DOB's March 21, 2018 letter. Education advised that, under PHEAA's contract, Education "owned the requested records" and instructed PHEAA that it was prohibited from releasing them. ECF No. 68-1 ¶ 47; ECF No. 64-16 at 2–3. That same day, PHEAA participated in a telephone conference with CT DOB, during which CT DOB "informed PHEAA that it would not rescind its demand for either compliance or, in the alternative, that PHEAA provide an explanation for its non-compliance with Connecticut law." ECF No. 65-4 ¶ 32.

## II.     PROCEDURAL HISTORY

PHEAA filed this action on July 2, 2018, seeking a declaratory judgment as to whether CT DOB's demands that PHEAA produce the documents are preempted by federal law. On September 13, 2019, I granted in part the Federal Defendants' motion to dismiss. ECF No. 59. In the surviving counts of the Amended Complaint, PHEAA seeks declaratory judgments "as to whether" federal law preempts Conn. Gen. Stat. §§ 36a-17, 36a-849, and 36a-851—the statutes the CT DOB cited in its letters seeking to enforce the document demands—"under the doctrine of field preemption" (Count Two), and "as to whether" federal law preempts those statutes "under the doctrine of conflict preemption" (Count Three). Am. Compl., ECF No. 34 ¶¶ 87, 97. The parties filed cross-motions for summary judgment on November 20, 2019. I held oral argument on April 14, 2020.

In my ruling on the motion to dismiss, I dismissed PHEAA's claims against the Federal Defendants, but I also found that the Federal Defendants could be joined as required parties under Fed. R. Civ. P. 19 to "bind them for purposes of res judicata." ECF No. 59 at 31. Following that ruling, the Federal Defendants raised a new argument in the parties' Rule 26(f) Report concerning their claim to sovereign immunity. ECF No. 62 at 3. I ordered the parties to provide additional briefing on this issue, ECF No. 63, which I address below in Part IV.

## III.    SUMMARY JUDGMENT MOTIONS

### A.  **Legal Standard**

Summary Judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence

demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). In this case, no one has suggested that there is a triable issue of fact, and the parties' cross-motions for summary judgment hinge on the legal question whether CT DOB's document demands are preempted by federal law.

### B. Discussion

The power of the States in our federal system is "concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause." *Tafflin v. Levitt*, 493 U.S. 455, 458 (1990). The Supremacy Clause states that the "Constitution[] and the Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Under the Clause, "Congress has the power to preempt state law." *Arizona v. United States*, 567 U.S. 387, 399 (2012). "Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 95 (2d Cir. 2012).

This case involves implied preemption rather than express preemption. Courts have recognized two types of implied preemption: field preemption and conflict preemption. Field preemption applies if "[t]he intent to displace state law altogether can be inferred from a framework of [federal] regulation so pervasive . . . that Congress left no room for the States to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (internal quotation marks omitted; alterations in original). Conflict preemption applies if "compliance with both federal and state regulations is a physical impossibility" (impossibility

preemption), or if "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (obstacle preemption). *Id.* (internal quotation marks omitted). In this case, PHEAA seeks declaratory judgments as to whether either type of implied preemption—field preemption or conflict preemption—applies to the statutes the CT DOB invoked in support of its document demands, *i.e.*, Conn. Gen. Stat. §§ 36a-17, 36a-849, and 36a-851. ECF No. 34 ¶¶ 47, 87, 97.

"In preemption analysis, courts should assume that the historic police powers of the States are not superseded unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. "This assumption is particularly strong where . . . a state or locality seeks to exercise its police powers to protect the health and safety of its citizens." *U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428, 432 (2d Cir. 2013). "Because consumer protection law is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required in this area." *Gen. Motors Corp. v. Abrams*, 897 F.2d 34, 41–42 (2d Cir. 1990); *see California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (explaining that consumer protection is a "historic police power[] of the States" because of the "long history of state common-law and statutory remedies against monopolies and unfair business practices"). When this presumption against preemption applies, courts should uphold state law "if there is any ambiguity as to whether the [state] and federal laws can coexist." *U.S. Smokeless Tobacco*, 708 F.3d at 433.

The State Defendants argue that the presumption against preemption applies in this case since consumer protection, including regulation of student loan servicers, is a traditional state police power. ECF No. 64-2 at 15. PHEAA and Education argue the presumption does not apply "where, as here, a state purports to regulate federal contracts and contractors." ECF No. 68 at 18;

ECF No. 70 at 11. I assume, without deciding, that the presumption does apply. Nevertheless, I find "compelling evidence of an intention to preempt," for the reasons discussed below.[1]

### 1. **Conflict Preemption**

Count Three of the amended complaint seeks a declaratory judgment as to whether Conn. Gen. Stat. §§ 36a-17, 36a-849, and 36a-851 "are preempted under federal law by the doctrine of conflict preemption." ECF No. 34 ¶ 96; *see also id.* ¶ 47.[2] As explained below, I find that, for federal contractors like PHEAA, obstacle preemption bars the enforcement of the CT DOB's licensing authority over student loan servicers, including the authority to examine the records of licensees set forth in Conn. Gen. Stat. §§ 36a-849 and 36a-851. I also find that the CT DOB's document demands were premised on its authority over licensees, rather than its general authority over persons under its jurisdiction as set forth in Conn. Gen. Stat. § 36a-17. In any event, I find that CT DOB cannot rely on its general authority because, at the relevant time, PHEAA was not a person under its jurisdiction. Finally, even if CT DOB did have authority over PHEAA, its document demands would still be preempted, because "compliance with both federal and state [law was] a physical impossibility" for PHEAA, *Arizona*, 567 U.S. at 399.

---

[1] I find that conflict preemption applies to the challenged provisions of state law without relying on Education's arguments expressed in its publication, "Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Loan Servicers," 83 Fed. Reg. 10619. Therefore, I need not determine whether Education's interpretation of the preemptive effect of its regulations and the HEA is entitled to *Skidmore* deference.

[2] Contrary to the State Defendants' argument in their opposition brief, ECF No. 67 at 14, this is not an "entirely new claim" raised for the first time on summary judgment. The amended complaint explicitly seeks a declaratory judgment "as to whether [Conn. Gen. Stat. §§ 36a-17, 36a-849, and 36a-851] are preempted under federal law by the doctrine of conflict preemption." ECF No. 34 ¶ 96.

### a.   CT DOB's Licensing Authority over PHEAA is Preempted

As noted, Section 36a-847 of the Connecticut General Statutes establishes a licensing requirement for all student loan servicers operating in the state: "No person shall act as a student loan servicer, directly or indirectly, without first obtaining a license for its main office and for each branch office where such business is conducted from the commissioner . . . ." Conn. Gen. Stat. § 36a-847(a)(1). Section 36a-849, which was adopted as part of the same legislation imposing the licensing requirement and is one of the three statutes targeted by PHEAA's preemption claim, requires licensees to "maintain adequate records of each student education loan transaction," and to make such records available to the Commissioner "not later than five business days after requested by the commissioner to do so." Conn. Gen. Stat. § 36a-849(b). Section 36a-851, also part of the 2015 licensing legislation for student loan servicers and also a target of the preemption claim, authorizes the Commissioner "to conduct investigations and examinations" and provides that, "[f]or purposes of initial licensing, license renewal, license suspension, license revocation or termination, or general or specific inquiry or investigation to determine compliance with sections 36a-846 to 36a-854," the Commissioner may "access, receive and use" records, including, among others, those relating to "criminal, civil and administrative history." Conn. Gen. Stat. § 36a-851(a)(1). In addition, "[f]or the purposes of investigating violations or complaints arising under sections 36a-846 to 36a-854, inclusive, or for the purposes of examination, the commissioner may review, investigate or examine any student loan servicer licensee or person subject to said sections as often as necessary in order to carry out the purposes of said section." *Id.* § 36a-851(a)(2).

Supreme Court precedent bars the CT DOB from applying these provisions to PHEAA's servicing of federal student loans under its contract with Education. In *Leslie Miller, Inc. v. State of Ark.*, 352 U.S. 187 (1956), the State of Arkansas convicted a construction contractor hired by

the federal government to build facilities at an air force base in Arkansas for failing to obtain a contractor's license required by Arkansas law. The Supreme Court reversed, holding that federal bidding statutes and regulations requiring the selection of "responsible bidder[s]" for federal contracts would be frustrated by an obligation to comply with overlapping state licensing requirements: "Subjecting a federal contractor to the Arkansas contractor license requirements would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the expressed federal policy of selecting the lowest responsible bidder." *Id.* at 190. Similarly, in *Sperry v. State of Fla. ex rel. Florida Bar*, 373 U.S. 379, 385 (1963), the Court vacated a Florida state court injunction that prohibited a patent agent, who was registered to practice before the U.S. Patent Office but not licensed as an attorney, from engaging in activities needed to prosecute matters before the U.S. Patent Office. The Court held that a "State may not enforce licensing requirements which, though valid in the absence of federal regulation, give the State's licensing board a virtual power of review over the federal determination that a person or agency is qualified and entitled to perform certain functions, or which impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress. No State law can hinder or obstruct the free use of a license granted under an act of Congress." *Sperry*, 373 U.S. at 385; *see also United States v. Town of Windsor, Conn.*, 765 F.2d 16 (2d Cir. 1985) (holding that enforcement of state building permit provisions against federal contractors would violate the Supremacy Clause and citing *Leslie Miller*); *United States v. Virginia*, 139 F.3d 984, 989 (4th Cir. 1998) (State of Virginia could not apply its licensing and registration requirements for private security businesses to contractors hired by FBI to perform background checks: "[T]he Virginia regulatory scheme frustrates the objectives of the federal procurement laws by allowing the state to 'second-guess' the FBI's responsibility determination

and by giving the state licensing board a virtual power of review over the federal determination of responsibility." (internal quotation marks omitted)); *Gartrell Constr. Inc. v. Aubry*, 940 F.2d 437, 439 (9th Cir. 1991) (finding that impermissible "interference occurs when . . . the state requires a contractor with the federal government to comply with its licensing laws").[3]

As in *Leslie Miller* and *Sperry*, the CT DOB's licensing requirements for student loan servicers overlap with Education's own criteria for selecting its servicing contractors. As noted above, the HEA allows only "entities which the Secretary determines are qualified to [service federal student loans] and will comply with the procedures applicable to the award of such contracts" to enter into contracts with Education. 20 U.S.C. § 1087f(a)(2). Further, Education must vet each student loan servicer to ensure that it is "responsible," meaning that it has adequate financial resources, can handle the performance schedule, has a satisfactory record of performance and business ethics, and meets other requirements. 48 C.F.R. § 9.103 to 9.104. Connecticut's

---

[3] Though neither *Leslie Miller* nor *Sperry* use the term preemption, the logic of those cases fits the doctrine of obstacle preemption. In *Leslie Miller*, the Court found the state licensing laws invalid because they "frustrate[d] the expressed federal policy of selecting the lowest responsible bidder." 352 U.S. at 190. In *Sperry*, the Court held that "[n]o State law can hinder or obstruct the free use of a license granted under an act of Congress." 373 U.S. at 385; *see also Gartrell Const. Inc.*, 940 F.2d at 439 (treating *Leslie Miller* as a preemption case); *but see Virginia*, 139 F.3d at 989 n.7 (noting "disagreement over whether *Leslie Miller* was a preemption or an intergovernmental immunity case" between plurality and dissenters in *North Dakota v. United States*, 495 U.S. 423 (1990)). But whether one characterizes *Leslie Miller* as a preemption case or an immunity case, the Supreme Court has made clear that, under the Supremacy Clause, state law cannot directly interfere with the federal Government's selection of its contractors. *See North Dakota*, 495 U.S. at 440 (plurality noting that the "central lesson" of *Leslie Miller* is that states "may not pass regulations which directly obstruct federal law"); *id.* at 454 (concurrence in part arguing that *Leslie Miller* was decided on the doctrine of federal immunity, which provides that "[i]t is of the very essence of supremacy to remove all obstacles to [federal] action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence" (internal quotation marks omitted)); *Virginia*, 139 F.3d at 989 n.7 ("[N]otwithstanding their disagreement over whether *Leslie Miller* was a preemption or an intergovernmental immunity case, both the plurality and the dissenters cited *Leslie Miller* approvingly and reaffirmed its holding.").

licensing requirements overlap with several of these federal requirements, including the requirements of financial responsibility and business integrity. *See* Conn. Gen. Stat. § 36a-847(c)(1)-(3) (permitting CT DOB commissioner to issue a license if "[t]he applicant's financial condition is sound," "[t]he applicant's business will be conducted honestly, fairly, equitably, carefully and efficiently," and if the applicant's officers, directors, trustees, and major shareholders are "in all respects properly qualified and of good character").[4] Some of Connecticut's requirements appear to be more stringent than the federal criteria, raising the prospect that the CT DOB might deny a license to a student loan servicer Education has selected using the federal criteria. *See, e.g.*, Conn. Gen. Stat. § 36a-847(c)(2)–(3) (permitting licensure of applicants who will conduct business "in a manner commanding the confident and trust of the community" and requiring "good character" from each officer, director, trustee, and major shareholder of the company).

Connecticut's licensing scheme for student loan servicers thus overlaps with—and potentially interferes with—Education's selection process for its own contractors. Like the

---

[4] The version of the statute effective at the time of CT DOB's document requests and at the time this lawsuit was initiated provided:

> The commissioner may issue a license if the commissioner finds that . . . if the applicant is a corporation or association, the president, chairperson of the executive committee, senior officer responsible for the corporation's business and chief financial officer or any other person who performs similar functions as determined by the commissioner, each director, each trustee and each shareholder owning ten per cent or more of each class of the securities of such corporation is in all respects properly qualified and of good character."

2015 Conn. Acts. 15-162, § 3(c)(3)(C). The statute was amended, effective October 1, 2018, to read:

> The commissioner may issue a license if the commissioner finds that . . . [e]ach control person, qualified individual, branch manager and trustee of the applicant is in all respects properly qualified and of good character.

2018 Conn. Acts 18-173, § 85(c)(3), codified at Conn. Gen. Stat. § 36a-847(c)(3).

provisions struck down in the *Leslie Miller* line of cases, Connecticut's requirements give the CT DOB "a virtual power of review over the federal determination" that a student loan servicer is "qualified and entitled" to service federal Direct Loans and impose on a federal contractor "additional conditions not contemplated by Congress." *Sperry*, 373 U.S. at 385. There is no "ambiguity," *U.S. Smokeless Tobacco*, 708 F.3d at 433; it is clear that the application of Connecticut's licensing scheme to federal contractors' servicing of Direct Loans presents an obstacle to the federal government's ability to choose its contractors. Even applying the presumption against preemption, therefore, the licensing scheme is preempted. Indeed, the rule of *Leslie Miller* applies even when the state laws at issue are consumer protection laws—a traditional area of state regulation. *Leslie Miller* and *Sperry* both found state licensing laws aimed at protecting consumers invalid under the Supremacy Clause. For these reasons, I find, and the State Defendants ultimately conceded at oral argument in this case, that the Clause bars CT DOB's attempt to assert licensing authority over PHEAA in connection with its servicing of federal Direct Loans. In doing so, I join the reasoning and conclusion reached as to a similar District of Columbia licensing scheme in a thorough opinion by Judge Friedman of the U.S. District Court for the District of Columbia. *Student Loan Servicing All. v. D.C.*, 351 F. Supp. 3d 26, 62 (D.D.C. 2018) ("*SLSA*") (holding that obstacle preemption, and specifically *Leslie Miller* and its progeny, bar a D.C. licensing scheme as applied to student loan servicers contracting with the federal Government to service Direct Loans).[5]

---

[5] The State Defendants submitted a Notice of Supplemental Authority on April 23, 2020, drawing the Court's attention to a recent Eleventh Circuit decision finding that a group of student loan borrowers' claims were not preempted by the HEA. *Lawson-Ross v. Great Lakes Higher Educ. Corp.*, No. 18-14490, 2020 WL 1815966, at *11 (11th Cir. Apr. 10, 2020). This decision does not alter my finding of conflict preemption under the *Leslie Miller* line of cases. The plaintiffs in *Lawson-Ross* sued a student loan servicer under the Florida Consumer Collection Practices Act and state common law, alleging affirmative misrepresentations. The case did not

**b.   The CT DOB's Document Demands Were Based on Its Licensing Authority**

The document demands made by the Commissioner to PHEAA in this case rested on the Commissioner's authority over student loan servicer licensees under Sections 36a-849 and 36a-851 of the Connecticut General Statutes. As noted, those demands were propounded in the form of a "Student Loan Servicer Management Questionnaire and Information Request" and sought information about both PHEAA and its servicing of loans in the PSLF program. ECF No. 64-7. The questionnaire referred repeatedly to the "licensed entity," *see, e.g.*, *id.* at 6, and sought, among other things, information about whether PHEAA or its employees were the subject of criminal, civil, or administrative actions or investigations, *id.* at 7–8; *see also* Conn. Gen. Stat. § 36a-851(a)(1) (granting commissioner access to "criminal, civil and administrative history information" "[f]or purposes of initial licensing, license renewal, license suspension, license revocation or termination, or general or specific inquiry or investigation to determine compliance with sections 36a-846 to 36a-854"). The Commissioner's follow-up correspondence pressing for responses to the questionnaire confirmed that it was based on PHEAA's status as a Connecticut student loan servicer licensee. *See, e.g.*, ECF No. 64-9 at 3 (December 18, 2017 email from CT DOB to PHEAA: "As a licensee with the [DOB], PHEAA must adhere to Connecticut's statutory requirements governing student loan servicers. . . . [F]ailure to provide such information may result in administrative action against PHEAA, including but not limited to suspension of your student loan servicer license in Connecticut."); ECF No. 64-14 at 2 (March 21, 2018 letter from CT DOB to PHEAA: "As a student loan servicer licensee, [PHEAA] is subject to the provisions set forth in . . . Sections 36a-846 to 36a-854."); *id.* at 2–3 ("Several Connecticut statutory provisions require

---

involve any attempt by the State of Florida to impose licensing requirements or exercise similar authority over the student loan servicer. The case does provide support for the State Defendants' position as to field preemption, but I do not reach that issue in this case.

student loan servicer licensees to produce records when requested to do so by the Commissioner in connection with an examination"); *id.* at 4 ("PHEAA's failure to produce the requested records to date . . . causes PHEAA to be in violation of . . . the Connecticut General Statutes. Such violations constitute grounds to revoke PHEAA's student loan servicer license in Connecticut."). And although PHEAA began servicing federal Direct Loans in 2009, ECF No. 68-1 ¶ 5, there is no evidence in the record that CT DOB ever investigated or requested documents from PHEAA until November 2017, just a few months after it obtained a license under Connecticut's student loan servicer licensing scheme, which went into effect in July, 2016. *See* 2015 Conn. Acts 15-162 (effective July 1, 2016).

The State Defendants argue, however, that their document demands were not based solely on the CT DOB's licensing authority, and point to provisions of Sections 36a-851 and 36a-17—two of the statutes cited in their letters and targeted by PHEAA's preemption claim—authorizing the Commissioner to obtain documents from "persons," in addition to "licensees." *See* Conn. Gen. Stat. § 36a-851(a)(2) ("For the purposes of investigating violations or complaints arising under sections 36a-846 to 36a-854, inclusive, or for the purposes of examination, the commissioner may review, investigate or examine any student loan servicer licensee *or person* subject to said sections as often as necessary in order to carry out the purposes of said sections" and may "direct, subpoena or order such person to produce" documents (emphasis added)); *id.* § 36a-851(d) ("The authority of this section shall remain in effect, whether such student loan servicer licensee *or person* subject to sections 36a-846 to 36a-854 . . . claims to act under any licensing or registration law of this state, or claims to act without such authority." (emphasis added)); *id.* § 36a-17 (allowing the commissioner to "require . . . *any person* to . . . produce a record or file a statement in writing, under oath, . . . as to all the facts circumstances concerning the matter to be investigated or about

which an action or proceeding is pending" (emphasis added)). I do not find this argument persuasive.

First, Section 36a-851 is part and parcel of the legislation Connecticut adopted in 2015, the core of which was the requirement that any student loan servicer seeking to operate in Connecticut apply to the Commissioner for a license. *See* 2015 Conn. Acts 15-162 ("An Act Concerning A Student Loan Bill of Rights," setting forth all of the provisions now codified at Conn. Gen. Stat. §§ 36a-846 to 854); Conn. Gen. Stat. § 36a-847 (imposing licensing requirement and specifying application criteria and content). Thus, references to "persons" in Section 36a-851 are qualified by the Commissioner's authority over student loan servicers under the Act, authority that stems from the licensing requirement: The Commissioner may "investigate or examine any student loan servicer licensee or person *subject to* . . . sections [36a-846 to 36a-854]," and he may do so "[f]or the purposes of investigating violations or complaints arising under" those sections, "or for the purposes of examination." Conn. Gen. Stat. § 36a-851(a)(2) (emphasis added). The only "persons" "subject to" sections 36a-846 to 36a-854 who are not licensed student loan servicers are (1) those who are applying to become licensed student loan servicers, Conn. Gen. Stat. § 36a-847 (stating that "[n]o person shall act as a student loan servicer . . . without first obtaining a license"); (2) those who are acting as student loan servicers while claiming not to be subject to "any licensing or registration law of this state," *i.e.*, student loan servicers who are required to be licensed but are not, *id.* § 36a-851(d); *see also id.* § 36a-850 ("No person who is required to be licensed and who is subject to the provisions of sections 36a-846 to 36a-854 . . . shall" defraud or mislead borrowers or engage in unfair or deceptive practices); (3) those who exercise control over a licensee, Conn. Gen. Stat. §§ 36a-847 (imposing requirements on "control person[s]"); *id.* §§ 36a-846 & 36a-485 (defining "control person" as "an individual that directly or indirectly exercises control over

22

another person"); (4) those who submit information to the computerized information system regarding licensees, Conn. Gen. Stat. § 36a-848(e); and (5) those who are agents or employees of a licensee, Conn. Gen. Stat. § 36a-852 (allowing license revocations for violations by agents, employees and others associated with a licensee). This list makes clear that the Commissioner's authority over "persons" set forth in Section 36a-851 is aimed at reinforcing the licensing requirement and making it effective, for example, by ensuring that persons associated with licensees are also subject to regulation. Section 36a-851 thus does not grant the Commissioner authority over "persons" independent of his licensing authority over student loan servicers and would grant him no authority over PHEAA in the absence of the licensing requirement. Because the CT DOB cannot constitutionally exercise licensing authority over PHEAA in its servicing of Direct Loans, PHEAA is not a "person subject to" the provisions of Sections 36a-846 to 36a-854 for purposes of the document demands.[6]

Second, while the third statute at issue, Section 36a-17, was not part of the 2015 Connecticut legislation and sets forth more general authority of the Commissioner, its authorization to obtain documents from "persons" similarly refers to persons within the jurisdiction of the Commissioner. Read in context, the language on which the State Defendants

---

[6] This means not only that the CT DOB cannot take action against PHEAA's license as a result of its failure to comply with the document demands but also that it cannot obtain a cease and desist order or civil penalties against PHEAA—as it also threatened to do in its March 21, 2018 letter—for PHEAA's performance of its Direct Loan servicing activities in Connecticut. *See Sperry*, 373 U.S. at 385 (state may not "impose upon the performance of activity sanctioned by federal license additional conditions not contemplated by Congress" and "[n]o state law can hinder or obstruct the free use of a license granted under an act of Congress."). Ordering PHEAA to cease and desist its Direct Loan servicing activities or imposing prohibitive monetary penalties against it for conducting those activities would interfere with Education's selection of PHEAA as a federal student loan servicer in the same way revoking its license would. Thus, the CT DOB's authority to obtain a cease and desist order or civil penalties against PHEAA for failing to comply with the document demands is likewise preempted.

rely—permitting the Commissioner to "require . . . any person to . . . produce a record"—makes clear that he may do so only in "carry[ing] out . . . [his] duties" and only within the context of "investigations or examinations concerning any person subject to the jurisdiction of the commissioner." Conn. Gen. Stat. § 36a-17(a). The State Defendants point to nothing in the Banking Law that would have brought PHEAA within the jurisdiction of the Commissioner absent the licensing scheme set forth in Sections 36a-846 to 36a-854, which I have found to be unconstitutional as applied to PHEAA's servicing of Direct Loans. Further, the only enforcement mechanism referred to in Section 36a-17 for entities not subject to the Commissioner's licensing authority is a subpoena. *See* Conn. Gen. Stat. § 36a-17(c),(f). In this case, as discussed above, the Commissioner issued a "questionnaire" to PHEAA as its licensee, rather than a subpoena, confirming that - citations in his correspondence notwithstanding – he was not relying on the general authority of Section 36a-17 in making the document demands.

In addition, it appears that, by its own terms, Section 36a-17 did not apply to student loan servicers at the time the CT DOB issued its document demands to PHEAA. As noted, Section 36a-17 refers to "person[s] subject to the jurisdiction of the Commissioner." Apart from specific grants of jurisdiction within the Banking Law, such as the licensing scheme for student loan servicers, the jurisdiction of the Commissioner is generally defined in Conn. Gen. Stat. § 36a-1, which lists the types of businesses to which the Banking Law, Title 36a, applies. That list now includes "student loan servicers," Conn. Gen. Stat. § 36a-1, but that term was added to the statute only in 2018, 2018 Conn. Acts. 18-173, § 1 (Reg. Sess.), and became effective October 1, 2018—almost a year after CT DOB first requested documents from PHEAA and three months after PHEAA filed this lawsuit. *See* 2015 Conn. Acts 15-162 (Reg. Sess.); 2017 Conn. Acts 17-233 (Reg. Sess.) (amending some provisions of §§ 36a-846 to 36a-850); *see also* Office of Legis. Research, Public

Act Summary: PA 18-173 at 1, https://www.cga.ct.gov/2018/SUM/pdf/2018SUM00173-R02HB-05490-SUM.pdf ("This act [PA 18-173] generally expands the banking commissioner's statutory authority . . . . [It] extends many of his existing powers over certain mortgage-related licensees . . . including investigatory power, to include . . . student loan servicers."). When CT DOB sought the documents from PHEAA, the Banking Law was not generally applicable to student loan servicers and, apart from the licensing provisions I have found unconstitutional as applied to PHEAA's servicing of Direct Loans, PHEAA was not a "person subject to the jurisdiction of the commissioner" under Section 36a-17.

Thus, even if this case were about the outer limits of the CT DOB commissioner's authority—as opposed to the lawfulness of CT DOB's actual attempts to compel the production of documents from PHEAA, which relied on its licensing authority—I would find that CT DOB lacked the authority to compel production of the documents it sought in the absence of the licensing requirement. And because the licensing requirement is preempted, CT DOB did not have authority during the relevant time period to demand documents under §§ 36a-17, 36a-849, or 36a-851.[7]

c.  **Impossibility Preemption Also Applies**

Even if the CT DOB did have investigative authority over PHEAA, independent of its licensing regime, its document demands would still be preempted, because PHEAA could not have complied with them without running afoul of federal law. For this reason, I also agree with PHEAA and Education that impossibility preemption bars the portions of CT DOB's demands that sought

---

[7] I need not and do not decide in this case whether the Commissioner or some other state agency, such as the Office of the Attorney General, could subpoena documents from PHEAA related to its servicing of Direct Loans as part of an investigation of, say, fraud or unfair business practices. I decide only that the authority the Commissioner sought to exercise here is preempted by federal law.

documents and information protected by the Privacy Act, since "compliance with both federal and state regulations [wa]s a physical impossibility" for PHEAA. *Arizona*, 567 U.S. at 399.

The State Defendants argue that disclosure of the records sought by their document demands was a "routine use" under the Privacy Act, and they point to one of the routine uses specified by Education in its September 2, 2016 SORN, which allows Education "to make disclosures to governmental entities at the Federal, State, local, or tribal levels regarding the practices of [Education] contractors . . . (*e.g.*, Federal Loan servicers . . . ) with regards to all aspects of loans and grants made under title IV of the HEA, in order to permit these governmental entities to verify the contractor's compliance with debt collection, financial, and other applicable statutory, regulatory, or local requirements." 81 Fed. Reg. 60687, ECF No. 64-13 at 6. Education took a different view, however, asserting in its March 26, 2018 response to CT DOB's request for the records that "Education does not agree that Sections 36a-847 to 36a-854 of the Connecticut General Statutes are 'applicable statutory . . . requirements' allowing disclosure under this routine use," because "[s]tate laws regulating Direct Loan servicing are preempted by Federal law" and because "your request . . . does not indicate how the disclosure is compatible with the purposes for which the information in the record was collected." ECF No. 64-15 at 2–3.[8]

Both the Privacy Act and the SORN suggest that Education has substantial discretion in defining and applying "routine uses." 5 U.S.C. § 552a(e)(4)(D) (requiring each agency to publish "each routine use of the records contained in the system [of records maintained by the agency],

---

[8] During oral argument, the State Defendants pointed out that the rationale that the requested disclosure was not a "routine use" because "state laws regulating Direct Loan servicing are preempted" merely repeats Education's preemption arguments and does not constitute an independent ground for withholding the documents under the Privacy Act. This may be so, but as discussed below, PHEAA was nonetheless bound by Education's Privacy Act determination, and nothing more was required for PHEAA successfully to invoke the doctrine of impossibility preemption.

including the categories of users and purpose of such use"); 81 Fed. Reg. 60686 (September 2, 2016 SORN stating that "disclosures [of information covered by a routine use] may be made on a case-by-case basis" and that "[t]he Department may disclose records" for each routine use described in the notice); *see also U.S. Postal Service v. National Ass'n of Letter Carriers, AFL-CIO*, 9 F.3d 138, 143 (D.C. Cir. 1993) ("We should bear in mind that the routine use exception to the Privacy Act, assuming the proposed use is compatible with the purpose for which the information is collected, is in the control of the government agency. The agency has a measure of discretion in publishing routine uses."). In any event, the State Defendants have not formally challenged Education's determination that its document demands do not constitute a "routine use" by, for example, suing under the Freedom of Information Act. *See U.S. Dept. of Defense v. Fed. Labor Relations Authority*, 510 U.S. 487, 491 (1994) (noting that Privacy Act "does not bar disclosure of information if disclosure would be required under" Freedom of Information Act). And given both Education's determination that the documents relating to federal Direct Loan borrowers could not be disclosed and the contractual provisions by which PHEAA acknowledged Education's ownership and control over the documents, PHEAA had no more right to disclose the documents than an employee of the Department of Education would have had. *See* 5 U.S.C. § 552a(m) (treating government contractor and employees of such contractors as employees of the agency for purposes of the criminal sanctions for violations of the Privacy Act set forth in Section 552a(i)).[9] Indeed, at oral argument, the State Defendants conceded that PHEAA was bound by

---

[9] PHEAA itself had no obligation to challenge or to ask Education to reconsider its refusal to disclose the records in order to invoke impossibility preemption. *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620–21 (2011) (generic drug manufacturers not required to ask FDA for help in changing brand-name label that conflicted with state law to avoid the conflict: "We can often imagine that a third party or the Federal Government might do something that makes it lawful for a private party to accomplish under federal law what state law requires of it. In these cases, it is certainly possible that, had the Manufacturers asked the FDA for help, they might have

Education's decision not to authorize disclosure of the records, and that PHEAA thus could not have complied with both Education's interpretation of the Privacy Act and the CT DOB's document demands. That suffices to support a finding of impossibility preemption. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (Impossibility preemption applies "where it is impossible for a *private party* to comply with both state and federal law." (emphasis supplied)). [10]

The State Defendants cite three cases to argue that Education cannot "prevent PHEAA from complying with a statutory records request from Connecticut DOB," but each case is distinguishable. ECF No. 64-2 at 28. In the first, the court held that student loan servicers could not invoke the Privacy Act to block the production of records sought in discovery under the Federal Rules of Civil Procedure, noting that the Privacy Act itself contains an exception for documents compelled by court orders. *Consumer Fin. Prot. Bureau v. Navient Corp.*, No. 3:17-CV-101, 2018 WL 3824367, at *2 (M.D. Pa. Aug. 10, 2018) (citing 5 U.S.C. § 552a(b)(11) (providing exception allowing disclosure "pursuant to the order of a court of competent jurisdiction")). The next two cases did not involve records protected by the Privacy Act. In *In re Bankers Tr. Co.*, 61 F.3d 465, 470 (6th Cir. 1995), the court found that, in a conflict between discovery rules in the Federal Rules of Civil Procedure and regulations of the Federal Reserve Board aimed at protecting from disclosure "confidential supervisory information," the discovery rules prevailed. The court found that the Board's regulations were promulgated under a "a general housekeeping statute" that did

---

eventually been able to strengthen their warning label . . . . If these conjectures suffice to prevent federal and state law from conflicting for Supremacy Clause purposes, it is unclear when, outside of express pre-emption, the Supremacy Clause would have any force." (footnote omitted)).

[10] Contrary to the State Defendants' argument that PHEAA could have complied with both federal and state law by disclosing redacted or deidentified versions of the requested documents, ECF No. 67 at 25, the State Defendants have not pointed to any evidence that CT DOB ever requested or would have accepted redacted versions of the documents.

"not provide 'substantive' rules regulating disclosure of government information" and did "not give it the power promulgate regulations in direct contravention of the Federal Rules of Civil Procedure." 61 F.3d at 470. This case does not help the State Defendants, both because it involved a conflict between two sets of federal rules—and thus raised no federal preemption issue—and because the Privacy Act does indeed "provide substantive rules regulating disclosure of government information." The third case is similar, except that it involved a determination that state discovery rules prevailed in a conflict with "housekeeping regulations" of another bank regulator, the Office of the Comptroller of the Currency, but the court stayed its order to give the OCC an opportunity to "make its case why a different conclusion is warranted." *Bank of Am., N.A. v. BDO Seidman, LLP*, No. 061705BLS1, 2007 WL 4357801, at *3–4 (Mass. Super. Nov. 26, 2007) (citing *In re Bankers Trust Co.*). Here, of course, Education has appeared and reiterated its view that disclosure of the records sought by the State Defendants is barred by the Privacy Act. Further, the "housekeeping regulations" at issue in *BDO Seidman* were not, unlike the Privacy Act, "substantive rules regulating disclosure of government information." *In Re Bankers Tr. Co.*, 61 F.3d at 470. *BDO Seidman* thus does not suggest that CT DOB's document demands would trump the broad, substantive non-disclosure rule set forth in the Privacy Act 5 U.S.C. § 552a(b) ("[n]o agency shall disclose any record which is contained in a system of records" without the individual's consent unless an exception applies), especially outside the context of litigation.

For these reasons, I find that impossibility preemption also prohibits any attempt by CT DOB to enforce its document demands.

### 2. **Field Preemption**

Because I find that conflict preemption applies—under both obstacle preemption based on the *Leslie Miller* line of cases and impossibility preemption—and adequately addresses the

predicament PHEAA faced in responding to the document demands that precipitated this lawsuit, I need not address whether field preemption also applies. Therefore, Count Two of the Amended Complaint, seeking a declaratory judgment as to whether the Connecticut statutes are preempted under the doctrine of field preemption, is dismissed as moot.

### 3.  **Intergovernmental Immunity**

In its Statement of Interest, Education argues that Connecticut's licensing scheme is barred by the intergovernmental immunity doctrine. ECF No. 70 at 14–19. Because I find that the State Defendants' document demands are preempted, I need not address Education's arguments regarding intergovernmental immunity.

## IV.    SOVEREIGN IMMUNITY

In my previous ruling on the motion to dismiss, I dismissed all of PHEAA's claims against the Federal Defendants but found that sovereign immunity did not bar joinder of the Federal Defendants under Rule 19 to "bind them for purposes of res judicata," since "Section 702 of the APA waives the federal government's sovereign immunity in actions for non-monetary relief against an agency or officer thereof brought under the general federal question jurisdictional statute." ECF No. 59 at 28, 31. Following that ruling, the Federal Defendants argued that Section 702 of the APA waives sovereign immunity only for "[a]n action in a court of the United States seeking relief other than money damages and *stating a claim* that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." ECF No. 62 at 3 (quoting 5 U.S.C. § 702) (emphasis supplied). Since PHEAA's amended complaint did not state a claim against them, the Federal Defendants argued, the APA waiver did not apply. I ordered PHEAA and the Federal Defendants to provide additional briefing on whether sovereign immunity required dismissal of the Federal Defendants.

After reviewing these additional briefs, ECF Nos. 66 and 69, I agree with the Federal Defendants that they should be dismissed from this suit entirely based on sovereign immunity. The plain language of § 702 of the APA waives immunity for actions "stating a claim" against an agency or an officer or employee of the federal government. This language is not ambiguous, but even if it were, "[a]ny ambiguities in the statutory language are to be construed in favor of immunity." *F.A.A. v. Cooper*, 566 U.S. 284, 290 (2012). My conclusion that PHEAA's amended complaint does not state a claim against the Federal Defendants therefore negates § 702's waiver of sovereign immunity.

A plaintiff in a suit against the federal government "bears the burden of establishing that her claims fall within an applicable waiver." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). PHEAA argues that its request for declaratory relief—which, as to the Federal Defendants, sought (as alternative relief) a declaration that "the Federal Defendants' prohibition on PHEAA's production of the Documents [to CT DOB] is not proper," ECF No. 34 at 23— satisfies the "claim" requirement of § 702, relying primarily on the Ninth Circuit case, *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070 (9th Cir. 2010). ECF No. 66 at 6. I agree with the Federal Defendants, however, that *Peabody* is distinguishable because the court in that case had not already dismissed all claims against the Secretary of the Interior. In *Peabody*, the court held that if either defendant, Peabody Western Coal or the Navajo Nation, were itself enjoined from enforcing an employment preference provision for members of the Navajo Nation under coal mining leases approved by the Secretary, then either defendant could "assert a claim against the Secretary requesting injunctive or declaratory relief" to prevent the Secretary from enforcing the preference provision in the leases. 610 F.3d at 1086. The court "therefore conclude[d] that neither Peabody nor the Nation is barred by sovereign immunity from bringing a third-party complaint seeking

prospective relief against the Secretary under Rule 14(a)." *Id.*; *see* Fed. R. Civ. P. 14(a)(1)

(allowing a defendant to "serve a summons and complaint on a nonparty who is or may be liable

to it for all or part of the claim against it"). The *Peabody* court concluded that the waiver in § 702

would apply because the third-party complaint would state a claim against the Secretary seeking

to prevent the Secretary from taking action that would contravene the defendants' obligations

under any injunction. Here, by contrast, I have already held that PHEAA's amended complaint

does not state any claims against the Federal Defendants. PHEAA also relies on *O'Leary v.*

*Moyer's Landfill, Inc.*, but the court in that case did not address the "action . . . stating a claim"

language in Section 702 and did not find that the receiver failed to state a claim against the EPA.

677 F. Supp. 807 (E.D. Pa. 1988). In fact, the court noted that the receiver likely could file a

"citizen suit against EPA under section 6972(a)(1)(A), . . . provid[ing] an alternate, wholly

independent, potential basis for this court's jurisdiction to join EPA." *Id.* at 816 n.5. Neither of

these cases convinces me that the § 702 waiver is applicable in this case, which does not state any

claim against the Federal Defendants.

In the alternative, PHEAA argues that joining the Federal Defendants under Rule 19 for

the purpose of *res judicata* does not constitute a suit against the sovereign and, so, does not infringe

sovereign immunity. This argument is unconvincing. As PHEAA acknowledges, "a suit is against

the sovereign . . . if the effect of the judgment would be to restrain the Government from acting,

or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963). The purpose of joining the

Federal Defendants was to "bind them for purposes of res judicata, preclude them from bringing a

collateral challenge to the judgment, and furnish a preclusion defense to PHEAA in any lawsuit

by Education to terminate the contract." ECF No. 59 at 27. If the Federal Defendants remain parties

to this action, the effect of the judgment would be to restrain the Government from certain actions—from bringing a collateral challenge to the judgment, for instance.

Because this action seeks to bind the Federal Defendants to my ruling on the motions for summary judgment and because the § 702 waiver does not apply, I find that the Federal Defendants are entitled to sovereign immunity. Therefore, the Federal Defendants are dismissed from this action, and I vacate the portion of my previous ruling joining them under Rule 19, ECF No. 59 at 22–32.

Given my finding of conflict preemption, Education is unlikely to take any adverse action against PHEEA as a result of CT DOB's document demands. Nevertheless, I note that PHEAA would have other remedies if Education did terminate its contract or take other "regulatory, disciplinary, or retaliatory action," as PHEAA feared when it filed this action. ECF No. 34 ¶ 87. As explained in my previous ruling on the motion to dismiss, the Court of Federal Claims would have jurisdiction over any cause of action arising from PHEAA's contract with Education, and the rights asserted by PHEAA and the relief it sought against the Federal Defendants in this case ultimately stemmed from that contract. Thus, it is not that PHEAA would lack a legal remedy against the Federal Defendants if the need arose (or if my preemption ruling is reversed); it is just that that remedy would lie in a different court.

## V.    CONCLUSION

For all the foregoing reasons, the State Defendants' motion for summary judgment, ECF No. 64, is DENIED. PHEAA's motion for summary judgment, ECF No. 65, is GRANTED. The Clerk is directed to enter judgment for PHEAA on Count Three of the Amended Complaint because federal law preempts the CT DOB's licensing authority over PHEAA's servicing of Direct Loans and the State Defendants' document demands made in reliance on that authority. The State

Defendants are hereby enjoined from enforcing their document demands and from requiring PHEAA to submit to their licensing authority. In addition, the Federal Defendants are DISMISSED from this action. The portion of my prior ruling, ECF No. 59, joining them under Rule 19 is hereby VACATED.

   The Clerk is directed to close this case.

   IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
   April 30, 2020